The opinion of the Court was delivered by
Sergeant, J.
This is substantially a question as to the right of property in a portion of one of the public squares of this city, and has been discussed with a learning and ability proportioned to its importance. The right it involves, is of a peculiar kind, and for its determination, requires an investigation into the origin and early history of the city, as well as a notice of several later transactions of the proprietaries, the commonwealth who succeeded to their rights, the city corporation, and the defendants or their predecessors.
It appears that William Penn, in July 1681, after obtaining a charter for the province, deeming a large town or city within its bounds, essential to the success of his enterprise, by the first article of the conditions or concessions agreed upon in England, stipulated with thosewho embarked with himin the project,and purchased large quantities of land in Pennsylvania, commonly called first purchasers, that on their arrival here, a certain quantity of land, or ground plat should be laid off for a large town or city in the most convenient place on the river, for health and navigation; and by article 5, that the proportion of ground therein should be ten acres for every five hundred acres of land purchased, (or two per cent.) if the place would allow it. Intending literally to fulfil his engagement, he ap *473 pointed Thomas Holme (his surveyor-general) and others, commissioners to lay out a city of ten thousand acres. A town on such a scale, however, would have scattered the inhabitants over many miles, and defeated the chief design of a city, which was, that it might be the residence of the merchants, gentlemen, artisans and others, who accompanied him, and had been accustomed in England to a town life; the centre of legislation, trade, arts and sciences in the new colony, and the germ of its civilization. On his arrival here, therefore, and consultation with such of the first purchasers as were present, Thomas Holme, under his direction in 1683, formed the present plan of Philadelphia, assigning to the first purchasers smaller lots on the streets, and adding, as a further compensation, larger tracts of what were called ‘ liberty lands,’ lying outside of the city, northwardly and westwardly, as appurtenant to their purchases in the country. The site of the city, its length and breadth were then fixed, and have since remained the same. The plan was engraved, and impressions taken for the use of those interested. It is entitled, “A Portraiture of the City of Philadelphia in the Province of Pennsylvania in America, by Thomas Holme, Surveyor-General, sold by John Thornton in the Minories and Andrew Sowle in Shoreditch, London.” A copy of this plan, certified by the surveyor-general to be a copy of an ancient general draught called a plan of the city of Philadelphia, remaining in the surveyor-general’s office, and purporting to be that made by Thomas Holme, was produced on the trial, and objected to as not evidence. But it was undoubtedly evidence, being a copy of an official paper on file in the proper place, of great antiquity and public importance. A copy of another ancient plan remaining in the office, was also produced, which is evidence on similar grounds.
In Hurst v. Dippo, (1 Dall. 20,) the list of first purchasers was admitted in evidence, to prove a grant of 5000 acres from William Penn, by deed alleged to be lost. In Morris v. Vanderen, (1 Dall. 64,) to prove title to a city lot, a copy from the Surveyor-General’s office of the same paper, was received. In Kingston v. Lesley, (10 S. R. 387,) Tilghman, C. J. says, it has often since been received: and on the same grounds the Court then admitted in evidence a paper certified by the Surveyor-General, to be a true copy of a list of the first grantees or renters from the proprietaries, extracted from book No. 31, remaining in the office. The book, the Chief Justice says, which contains the list in question, “ is among the public books preserved in the Land office; and the list itself, it must be presumed, was made out from ancient papers, many of which may now be lost, or perhaps are not in existence. It may be presumed too, that it was made out as a matter of publie convenience, and not with a view to private evidence.” “ Formerly,” it is said in Ream v. The Commonwealth, (3 S. & R. 209,) “ they were in the custody of the proprietaries and their officers, but since the Commonwealth became *474 a sovereign state, the books of the land office have been committed to the charge of officers appointed under the authority of the government:” and by the act for.establishing a land office, passed the 9th of April, 1781, copies of all their records and papers are made as good evidence as the original. A copy therefore, of a map of the city, remaining in the Surveyor-General’s office, as one of the records or papers of that office, received and accredited by the officers as authentic, and proved to be so considered, and to be an ancient paper, of course handed down by the proprietary’s officers from early times, and relating to its public and official acts, is evidence. Indeed, it stands exactly on the same footing with the list of first purchasers : for this list merely refers to numbers “ in the city draught,” without which, their situation could not be found, and the list itself, would be unintelligible and useless, and the title lost. The presumption i's, that these maps were placed there by the proprietary or his officers, as public documents for the benefit of all concerned, in a matter of great public importance. They have been placed where they ought to have been, in the source and depository of all matters relating to the origin of land titles in Pennsylvania, superintended by a public officer of the highest authority, and open to public inspection, where every person might resort for information as to land titles. Even a survey adopted by the land office, though not made by the regular officer, is evidence; Shields v. Latta, (2 Yeates, 219); it being considered by the Court enough, in order to justify their being read to the jury, that they had been accepted into the Surveyor-General’s office, acknowledged by the receiver-general, and recognised by the board of property: and in Ross v. Cutshall (1 Binn. 402,) the articles of agreement between Lord Baltimore and the proprietaries, dated the 4th of July, 1760, acknowledged before a master in chancery, and enrolled in chancery in England, not proved, nor recorded here, were admitted; the Court saying it was an ancient deed, and might be considered in the light of a state paper well known to the Courts of justice, and which has been admitted as evidence on former occasions.
Now the first of these plans lays down the streets of the city and the five public Squares, lying across the streets, so as not to be mistaken or confounded with the rest of the ground assigned for lots or left vacant. The lots of first purchasers are marked on the plan by numbers. In three of the Squares, the lots run up to them, and in , front of them, giving ten lots on the south and east of the north-east public Square; six lots on the north and east of the south-east public Square; and five lots on the north and west of the south-west public Square ; but no lots are placed upon the Squares. So the lots continue along High street to the Centre Square, both from Delaware and Schuylkill Front streets, but stop at its boundaries. The second plan agrees with the former; but in addition,the north-east and south-east Squares have written on their face “eight acres for public *475 uses;” the north-west, “ eight acres given for public uses by Wm. Penn, Esq.;” the south-west “ eight acres allotted for public uses, &c.” On the Centre Square is written “ Centre Square ten acres.” This is strong evidence to show that these spaces of ground were laid out as squares for public uses, distinct from the streets and lots and other property in the city bounds, when the original plan of the city was made by its founder.
The advertisement annexed to the list of first purchasers, stands on the same footing as the list itself. After describing the site of the city and its advantages, it says, “ in the centre of the city is a square of ten acres; at each angle are to be houses for public affairs, as a meeting house, assembly or state house, market house, school house and severally other buildings for public concerns. There are also in each quarter of the city a square of 8 acres, to be for the like uses as the moorfields in London.” Moorfields were secured to the city of London by charter, dated October 16th, 1638, from being built on, and that they should be put to such like common and public uses, as they had been and were used for.
Another proof of the same facts and of the strongest character, is a letter from Wm. Penn to the society of free traders, (who were first purchasers,) dated August 16th, 1683, in which he writes thus: “Philadelphia, the expectation of those that are concerned in this province is at last laid out, to the great content of those here, that are any ways interested therein. I say little of the town itself, because a plat from it will be shown to you by my agent, in which those who are purchasers of me will find their names and interests.” This letter is quoted from Penn’s works, by Mr. Smith, in his edition of the laws printed by the authority of the Legislature; and may be found in Proud, and various other historical works; and of such ancient historical documents, proceeding from a public source, there is no other evidence to be had after the lapse of time. There is no better evidence that I know of, of the concessions or agreement of Wm. Penn, with the first purchasers, than that they are contained in histories and books, and have been treated as authentic from the beginning. A general history may be admitted, to prove a matter relating to the kingdom at large. B. N. P. 248. 1 Phil. Ev. 338. In the case of St. Katharine’s Hospital, Lord Hale allowed Speed’s Chronicles to be evidence of a particular point of history in the time of Edward III. (lb.) Chief Justice Pemberton saying, he knew not what better proof they could have. In Neale v. Fry, (cited 1 Salk. 281,) to prove a forgery of a deed, chronicles were produced and admitted in evidence to show the time when the Council of Spain received the surrender by Charles V., and his son Philip took his titles upon him.
That five public squares were thus laid off by the founder and the first purchasers here, in the original plan of the city in 1683, and were then dedicated to public uses, is thus a fact as clearly established as *476 any ancient fact can be by evidence; especially as no plan or draught or statement to the contrary, has ever been made or suggested, in those times or for along time after. If there is any fact in the history of the city universally acknowledged without question, by its inhabitants, by its founder, its historical writers, its maps and plans, and owners of property, and settlers, it is that Penn laid off' five public squares for public uses. And as we have the matter further, the fact appears more and more confirmed.
Wm. Penn’s second visit here, was sixteen years after his first departure. During that period, a change had occurred in public affairs in England, and in his private circumstances and feelings, as well as in the city and province. Matters of property here derived a much greater interest from these causes: and transactions then occurred which have been introduced into this case, and have an important bearing on the question before us.
In the same plan of the city, which appears to have been familiar to all, and was the basis of their correspondence and acts, there was a tract lying between the Delaware Front street and the river, the whole breadth of the city, called the river Front or Bank; on which, in the plan, no lots were laid off". The lot holders on Front street, who were among the most influential of the first purchasers, had claimed a right to the bank fronting them, beyond the street, down to the water, to build and use as they pleased, probably as assort of riparian owners, and sent a remonstrance and address to Penn to that effect. But he denied this pretension, stating that they were bounded by Front street, that the rest of the ground next the water, belonged to front lot men no more than back lot men, that against the street common wharves might be built, but into the water and shore was no purchaser’s right. He moreover stated that the top of Front street should be a common exchange or walk. And accordingly, as early as 16S4, the next year after the plan, (and perhaps sooner, for We have had but a few patents produced,) he sold lots on the Bank», restricting the purchasers from raising their buildings higher than four feet above the level of Front street, (provided subsequent purchasers were so restricted,) and reserving an improve-able ground rent of one-third of the value at the end of fifty-one years. In 1890, however, sales were made without this restriction, and King or Water street was regulated. The whole bank was after-wards sold out, the purchasers being bound to maintain certain stairways from Front street to the river. As this tract, however, lay on the water, certain points of it were from the first settlement, used as landing places, and indeed, were then the neighbourhood of the first residents. These were the Blue Anchor, (now the Drawbridge,) and the Penny Pot House, (now the corner of Vine street,); and being used constantly as such, were, not, it would seem, sold to any individual, but became indispensable for access to the city, and were employed for that purpose.
*477 So in the original plan, there lay northward and southward of High street, a considerable space of ground, on which no lots were laid off at all, there being no first purchasers entitled to them; and many others to the westward were never taken up by those they were assigned to. A discontent seems to have existed, that they were not given as the property of the city, and the idea is even intimated that by the concessions, Wm.- Penn was to give the first purchasers a city, and therefore these belonged to them in common. But the concessions themselves do not justify this idea; they are that a certain quantity of land or ground plat, should be laid out for a large town or city, and that every adventurer or purchaser, should by lot have so muck therein as would answer to his proportion of land. And Wm. Penn’s own letter to the society of Free Traders, states that the city was laid out to the full content of all concerned. And in his answer to the assembly in 1701, he alleges theconsfent of the first purchasers here to the re-aplotment, and in that, each purchaser’s share is lotted and bounded, and the rest was made up by liberty-lands. At the same time it may not be improbable, that the gift of the squares containing 42 acres, was a kind of satisfaction for this expectation which some had entertained, though without any engagement to that effect on his part.
The river front ceased to be an object of discussion: but the streets, and the commons, as they were called, remained so; and a further cause of complaint was the quit rents reserved on the lots laid out. A correspondence occurred between William Penn and the assembly just before his departure, in which these subjects were finally adjusted, and a charter was given to the city of Philadelphia, specifically naming them, and ascertaining the rights of the city. This correspondence is to be found entire in the 1st volume of the Votes of Assembly, 145, 148, and I shall extract such parts as relate to them.
The eighth item of the address of the Assembly to Wm. Penn, in 1701, (incited by an address from the inhabitants of Philadelphia,) is thus : — “ VIII. That whereas the proprietary formerly gave the purchasers an expectation of a certain tract of land, which is since laid out about two miles long and one mile broad, whereon to build the city of Philadelphia, and that the same should be a free gift, which has since been clogged with divers rents and reservations, contrary to the first design and grant, and to the great dissatisfaction of the inhabitants, we desire the governor to take it into consideration.” He answers, “ you are under a mistake in fact. I have tied you to nothing in the allotment of the city, which the first purchasers then present did not seem r.eadily to comply with, and I am sorry to find their names to such an address as that presented to you, who have got double lots by my re-aplotment of the city, from 50 to 102 feet front lots. And if they are willing to refund the 52 feet, I shall, as you desire, be easy in the quit rents, although this *478 matter solely refers to the first purchasers, and to me as proprietary.”
The 9th item of the Assembly address, is, “ That the land lying back of that part of the town already built, remain for common, and that no leases be granted for the future to make enclosures to the damage of the public, until such time as the respective owners shall be ready to build or improve thereon; and that the islands and flats near the town, be left to the inhabitants of this town to get their winter fodder.” Answer. . “ You are under a misapprehension to think that a fourth part of the land laid out for a city, belongs to any body but myself, it being reserved for such as were not first purchasers, who might want to build in future time. And when I reflect upon the great abuse done me in my absence, by destroying of my timber and wood, and how the land is overrun with brush, to the injury and discredit of the town, it is small encouragement to grant your request. However, I am content that some land be laid out for the accommodation of the town, till inhabitants present to settle it, under regulations that shall be thought most conducing to the ends desired; about which I shall consult with those persons chiefly concerned therein. And for the rest of the 9th article about the islands, I know not which you mean, nor on what terms desired, it being an independent property from the town, if not from the province.”
The 10th item of this address, is, “ That the streets of the town be regulated and bounded, and that the endb of streets on Delaware and Schuylkill be unlimited, and-left free to be extended on the river as the inhabitants shall see meet; and that public landing places, at the Blue Anchor and Penny Pot House be confirmed free to the inhabitants of this town, not infringing any man’s property.” Answer. “ About the ends of streets and other public landings of this town, I am willing to grant the ends of streets, when and where improved, and the other according to your request.”
There was here then an understanding on these disputed points, how far the proprietary would grant them to the city; and as he was about departing for England, the inhabitants set about procuring a charter, in which they should be solemnly recognized and settled forever. Accordingly, he granted the city a charter, dated the 25th of October, 1701, in which they are inserted. It ordains, among other things, that the streets of the city shall forever continue as they are now laid out and regulated: and that the end of each street extending into the river Delaware, shall be and continue free for the use and service of the said city and the inhabitants thereof, who may improve the same for the best advantage of the said city, and build wharves so far out into the river there, as the Mayor, &c. shall see meet. It then provides, by various clauses in the common style to incorporate them, and vest them with various franchises; ana in the close, are these provisions:
*479 “ And I do also ordain, that the landing places now and heretofore used at the Penny Pot House and Blue Anchor, saving to all persons their just and legal rights and properties in the land so to be open, as also the swamp between Budd’s buildings and the Society hill, shall be left open and common for the use and service of the said city and all others, with liberty to dig docks and make harbours for ships and vessels, in all or any part of the said swamp.”
“ And I do hereby grant, that all the vacant land within the bounds and limits of the said city, shall remain open as a free common of pasture, for the use of the inhabitants of the said city, until the same shall be gradually taken in, in order to build or improve thereon, and not otherwise. Provided always, that nothing herein contained shall debar me or my heirs in time to come from fencing in all the vacant lands that lie between the Centre Meeting House and the Schuylkill, which I intend shall be divided from the land by me allotted for Delaware side, by a straight line along the Broad street, from Edward Shippen’s land through the Centre Square, by Daniel Pegg’s land; nor shall the fencing or taking in of any of the streets happening to be within that enclosure, on Schuylkill, be deemed or adjudged to be an encroachment, when it shall not interfere or stop any of the streets or passages leading to any of the houses built or to be built on that side, any thing herein contained to the contrary notwithstanding.”
Thus was there obtained from William Penn, a grant of the landings specified, and the landings at the ends of streets, and what was necessary to the enjoyment of the latter, the permanence of the streets as laid out: and as to the commons, only a right to enjoy them till improved, with an express reservation to him, of a right to fence in all to the westward, except so far as they stopped the passages to buildings by owners claiming or to claim under him. But nothing was said in this charter about the squares; because there never had existed any dispute in relation to them. No one, the founder or any other, from the year 1683 to 1701, claimed a right in them different from the known appropriation in the plan of the city. Charters are commonly for the purpose of granting franchises and corporate privileges, not for the transfer or securing of property. But sometimes, when a doubt or dispute has existed as to rights to property, they are used to declare and secure them, as here was done in reference to claims disputed. But the public squares were not necessary to be inserted, simply because they had never been questioned or doubted. They were known to have been dedicated by the founder with as much certainty and solemnity, as the city bounds or the lots of the first purchasers, and had the same evidence of their existence. I do not, therefore, consider the omission to insert the squares in the charter as any argument against their being granted by the founder in the manner above stated. But it is observable that, though they are not granted, there is in this charter, *480 an.express reference to one of them by name; for in the clause relating to the commons, Wm. Penn expressly declares his intention to divide the lots on the Schuylkill side, from those on the Delaware side, by,a straight line along Broad street; “ through the Centre square.” The Centre square is here recognized as known to all: it was one of five, and stood on the same foundation as the rest; and the recognition of one, nothing to the contrary appearing, is tantamount to a recognition of all.
In 1706 we had another transaction, in which the existence of these squares is expressly recognized by the commissioners of property. On the application of the corporation of Philadelphia, a patent was issued to them for the chief part of the South-east public square; which as well as the previous warrant, recites its “ being one of those squares, which at the' original plotting of the said city, were intended for public uses,” coinciding with all that we have previously found in relation to them. It is said, however, that the word here is “ intended,” and not dedicated, and that though intended, the title never passed till something further was done, and the proprietary might withhold that further act. But there •was not only such an intention in the founder; there were his solemn acts and letters, which show that it was already laid out in his plot of the city, in concert with the first purchasers, and proclaimed to all the world, first purchasers as well as future purchasers, as part of the plan. It would be a fraud in a founder of a town or city to form a plan in concert with those who bought of him, and thereby profess to lay out a part for the public use, and then attempt to withdraw it. He could no more do so than he could withdraw their lots aftér they were assigned to them. The enjoyment of these privileges was part of the consideration of their agreeing to the plan; and any open attempt by the proprietary to do so, would have been instantly resisted. William Penn himself, however, whose virtue and talents will always place him among the great men of his age, never attempted thus to act. Though tenacious as to his property, on his second visit in 1701, occasioning thereby much discussion on the subject of city property, no expression, act, or suggestion of his is found during that time or afterwards during his life, manifesting a thought of withdrawing or curtailing his gift of these squares in 1683. They were the only grant to public uses which he made at his first visit: at the second the assembly obtained a few further privileges, but he refused their more important requests.
Nor can I consider this .patent as the acceptance of a new grant by the city from the proprietary’s commissioners of property, and therefore an evidence, that the property remained at his disposal till he chose to confirm it by a formal conveyance. The original dedication was a grant of the ‘ most solemn and indelible character, and could receive no confirmation from any subsequent act of the pro *481 prietary or his agents. Considered in this point of view, the patent was a matter of supererogation. But there was another object for which this patent might well operate. The public uses were not defined, and they are here declared.by the bestowers of the gift on the one hand, and the corporation, its guardians, on the other, namely, in the first instance, for a public burial-ground, not confined to the benefit and emolument of any one religious corporation, to the exclusion of others, or to any class of persons or people of any nation, but for every body — for the public. And in the then state of the city, this was a proper use to be made of the square, furnishing a decent burial to the stranger and the poor. It lay far west of the city buildings, which were then confined chiefly to Water and Front streets: the whole around it was open or covered by wood and brush. But the patent itself is carefully drawn so as to recognise the ulterior uses which the public would require, and which are the same, no doubt, as were in the contemplation of William Penn in 1683, whose enlarged views were not limited to the present, but looked to the interests of future generations. Ft was lo be “ for a common and public burying place, for the service of the city of Philadelphia, for interring the bodies of all manner of deceased persons whatsoever, whom there shall be occasion to lay thereinbut this was not all, it is declared, that “ for the further improvement of the-said burying place, he grants full and free liberty to the mayor, &c. to inclose, fence, plant, build, or by any other ways or means whatsoever, to improve the aforesaid piece of ground, as they from time to time should see convenient.” This early recognition of its uses by the personal friends and confidential officers of William Penn, shows the understanding at that time.
It continued a potter’s field down to the revolution ; but since then the progress of the city up to it and beyond, has rendered such an use of it no longer proper, and demanded the ulterior use, that of setting it apart as a source of air, recreation, and ornament, and a spot of incalculable value as such in the midst of a population already dense, and daily increasing in number and closeness of buildings.
From this time down to the year 1741, we hear nothing more about these public squares. William Penn died in 1718 : his second son, Thomas Penn, was then a minor: the province had here, as governors, none of the family until 1732, when Thomas Penn arrived, and on behalf of his brothers John and Richard and himself, assumed the place of governor.
In 1741 several transactions occurred relating to two of these squares, in which Thomas Penn undertook to make dispositions in regard to some of them as his private property, alleging that they were reserved as such by his ancestor William Penn, or were vacant ground. On the 1st of June 1741, he issued the warrant, which is the foundation of the claim of the defendants, to a portion of the North-eastern public square. This warrant is signed by Thomas *482 Penn, ánd is directed to Benjamin Eastburn, Surveyor-General, and recites, that “ whereas Philip Bohm and Jacob Seigel had requested that we would be pleased to grant them to take up, in trust for and for the use of the German Congregation in the City of Philadelphia, a vacant lot or piece of ground within our said city, situate between the Sixth and Seventh Streets, bounded northward by Vine Street, eastward and westward by vacancies, and southward by the ends of Sassafras Street lots, containing in length north and south 306 feet, in breadth east and west 150 feet, for which they agree to pay to our use the sum of £50 sterling, together with the yearly quit rent of 5 shillings sterling, or value of the said quit rent in coin current, «fee.” and then requires him to survey the said vacant lot and make return. In January, 1745, £13 sterling, 4 years interest, and 4 years quit rent were paid to the Receiver-general, stated in the receipt to be “ due on a lot between Sixth and Seventh streets, now in the possession of the German Congregation.” On the 9th Dec. 1763, a month or two after the arrival of John Penn, grandson of the proprietary, the sum of £189 0 7 was paid to the proprietary in full for the lot: and on the 14th December, 1763, a patent issued. A survey had been made two days before the patent issued, viz. on the 12th December, 1763, as appears by a note written within the lines of the lot, marked on a diagram filed in the surveyor-general’s office, and signed by John Lukens, Surveyor-General, as follows : “ See a warrant granted to Philip Bohm and Jacob Seigel, dated 18th June, 1741, surveyed 12th December, 1763, and returned the same day into the Secretary’s office for the German Congregation.”
If this square were really a vacant lot as here stated; if it were one of those not allotted to the first purchasers, nor granted to any subsequent purchaser, nor dedicated to the public, then undoubtedly Thomas Penn, as the representative of the proprietary’s family, the heirs of William Penn, had a just and perfect right to sell and dispose of this lot or any part of it to such persons and for such prices as he thought proper. But if it was, as it appears to bé established by the clearest and most indisputable proof, by the concurrent act and consent of his father, of the first purchasers, and all subsequent inhabitants and purchasers within the city of Philadelphia, given or set apart in trust for public uses in the original plan of the city, by which all rights were regulated and adjusted, and were inherited, transmitted and enjoyed; it was not vacant ground: it was sacredly appropriated : and he had no more right to grant away a foot of it than he had to sell over again a lot assigned to a first purchaser and patented to him. This assertion that it W'as so, as well as another transaction about the same time, which will be after-wards mentioned, may lead us to believe, that he really thought he had the right. But his assertions that it belonged to him as vacant or as a reservation, are no evidence of the fact: and have no weight against the conclusive evidence to the contrary. And whatever *483 may have been his view of the matter-, we have evidence in this cause, that the knowledge of the original destination of these squares continued to be perfectly well known to the citizens of Philadelphia, and that their feelings were alive to their importance. For we have evidence, (and to show that this claim of the proprietaries was not acquiesced in by the public, it is good evidence,) that he, in 1751* then in England, offered a large portion of the residue of this square, and actually conveyed it to the Pennsylvania Hospital by patent, calling it therein, “ a square of vacant land,” and alleging that it was “reserved” to the proprietaries. This grant the managers, (Joshua Crosby, Benjamin Franklin, Thomas Bond and others, of the most intelligent and influential citizens of the time,) declined receiving: stating the place to be unwholesome and not adapted to their purpose, yet intimating in the strongest manner which their relation to him permitted, that hé had no right to dispose of it. They say in their remarks, (which with their letter was presented to Thomas Penn,) after noticing its unhealthiness and unsuitableness — “ besides, as it is part of a square allotted by the late Hon. Proprietary for public uses, as the old maps of the city will show, our fellow citizens would tax us with injustice to them, if we should accept of this lot by a grant from our present proprietaries, in such terms as would seem to imply our assenting to their having a right to the remainder of the square.” And in their letter in 1752, they state their having had a survey, and found it unhealthy, and that “ the dissatisfaction which appeared and still subsists among our fellow citizens on the proprietaries claiming a right to make that grant, is so great, that if there were no other objection, we would not run the risk of increasing it.” And again, they conclude, “ we shall rather, endeavour to purchase a lot on a proper situation than to build the house in an inconvenient place, or to accept of any lot on such terms as we know would give a general dissatisfaction.” This is ample evidence that the citizens of Philadelphia, at that day, knew the foundation of their rights to these lots; that dissatisfaction already prevailed, and would be increased by an attempt by the proprietary to withdraw them, under the idea that they were vacant or reserved.- And the date of the payment- shows, that'Thomas Penn never received the consideration money, but its payment was delayed for 22 years until just after the arrival of his nephew, John Penn, personally a stranger to all that had occurred.
There is another example of a similar kind, on which much obscurity rests; but it does appear by documents referred to on the trial and argument here, that at or about the same time as the grant to the defendants, the proprietary • conveyed the original North-west public square to James Hamilton, whose liberty lands seem to have joined it, and under whom it has been since held. But it also appears, that ample compensation was made for it to the public, by the appropriation of another square by the proprietary’s *484 officers, a little further to the westward, which has from that time stood in lieu of it. This fact, so far asdt goes, is strong evidence that the proprietary, Thomas Penn, and his officers, considered themselves bound, if they took away one square, to substitute another equally valuable, thereby recognizing the public right. The opposite square, the South-west, and the Centre square were also moved the same distance westward; and a change made in the streets running north and south, beyond Eighth. street; substituting fourteen streets east of Broad street, and eight west of Broad street, instead of eleven east and eleven west of it, as they formerly stood. It is possible the grant of the original North-west square to Hamilton made it necessary for the sake of uniformity, to shift the South-west and Centre squares; though another motive is attributed by Read in his book. But whatever may have been the reason, the public interests were not injured by it; they received the same number of streets and squares, and it has never been questioned i indeed it is only in one book we find any notice of it. (See Read’s explanation of his map.) But as to the North-east square, the one now in question, no change of situation has ever been made: it stands where it did in the original plan of the city; the public uses uninterrupted from 1683 to the present day, except so far as it was occupied by the defendants.
We have no further evidence in this cause, until the year 1774, when John Read (above referred to,) made a map of the city and liberties, in which the lots, streets and public squares of the former, and the site and boundaries of all the liberty lands, with various particulars relating to the foundation of the city, and the titles of first purchasers, prior titles of the Dutch, Swedes, &c. are laid down. This map is on file in the office of the Secretary of the Commonwealth, and has been objected to as not being evidence. It exhibits great research and industry. Its plan of the city coincides with the original one, in laying down the public squares, and marking them as given to public uses. His book, called an explanation of his map, which is denied to have been given in evidence, exhibits the same labour; but the controversial spirit pervading it, detracts from the weight it would otherwise possess, as an authority. I lay no stress upon either of them in the decision of this case.
The next period at which we find any evidence, is the year 1776, when it appears the German Lutheran Congregation purchased of the proprietary, a lot of ground lying westward of the south-east public square; and John Lukens made a survey for them returned into the office, in which he marks the ground eastward of them as “ A public square.” As evidence to affect the defendant’s title directly, this would not be operative, because it was long after the date of their grant: but as evidence of the proprietary’s officer, the Surveyor General under them, that this ground was reputed in the Land office, to be of that character at that day, it is evidence. General reputation, is evidence of a public right, 1 Phill. Ev. 205 ; and it goes *485 also to show that the claim of the proprietary to treat this lot as vacant, was not acquiesced in.
But it is said that the Commonwealth after the revolution, when they succeeded to the domains and rights of the proprietaries, deemed this square to belong to them, and treated a portion of it as such: and hence it is argued, that if the commonwealth as representative of the proprietaries, had this right, the proprietaries had it before them. The facts appear to be, that the only interest the commonwealth had in it was a powder magazine erected on a part of it, which the parol evidence shows was there in 1784, and afterwards: and by a resolution of the legislature in 1791, they directed the possession of it to be delivered to the corporation of the city, for storing oil for lamps, until otherwise disposed thereof. This shows no more than that the building belonged to the commonwealth, who had probably erected it during the war, and that they held it at their disposal. But there is no evidence that they did not build and occupy it with the consent of the city: and as the city occupied all the rest for hay-scales, or paving stones, the presumption would be that they did. The use as a powder magazine was a public use, of paramount importance at that time; and if the commonwealth erected the building, .they had the control of it.. But there is no evidence that they claimed a right to the square itself, or any part of it, as their exclusive property, by succession to the proprietaries ; or attempted to divert it from the purposes for which it was first set apart. Their temporary occupancy was for a public use, and so far consistent with the original grant by William Penn: as was that of the city afterwards for storing oil, and of the remainder, (except the burying ground,) for hay-scales and paving stones, taking into the view the extent of the city then. The magazine was long since removed, and no claim or pretension made by the commonwealth to sell or dispose of the ground, but it passed into the occupancy of the city authorities, its proper guardians and managers. The commonwealth in all emergencies of peace or war, never thought, of selling the public squares of this city; though the vacant city lots have been sold under its authority.
When property is dedicated’or transferred to public use, the use is indefinite, and may vary according to circumstances. The public not being able themselves to manage or attend to it, the care and employment of it must devolve upon some local authority or body corporate as its guardian, who are in the first instance to determine what use of it from time to time, is best calculated for the public interest, subject as charitable uses are, to the control of the laws and the courts, in case of any abuse or misapplication of the trúst. The ' corporation has not the right to these squares so as to be able to sell them, or employ them in a way variant from the object for which they were designed; but they may allow them to remain unimproved or unoccupied, while Buildings are too remote to render it proper. *486 They may afterwards use, or permit them to be used for depositories of public property, such as paving stones, or offals of the city — for hay-scales — for- a powder magazine — for a public burying ground; and finally, when a close population surrounds them, for recreation and ventilation, ornament and thoroughfares of the city. All these are public uses, and have been employed in the different epochs of the city. .In the same manner as to the public landings granted to the city by the founder, and others in the adjoining districts, they were for a time unwharfed, then wharfed and used for landing of passengers, and of lumber, afterwards for the cording of wood, and now several of the most valuable let out for steamboat landings and other commercial purposes. This has been the uniform practice, and is consistent with the objects for which they were bestowed. But the defendants’ use of this ground was not a public use; it was confined to one corporation, and devoted to the interment of their dead, to the exclusion of the rest of the community. In addition to which, in the present state of the city, its appropriation for a burial place even for public purposes, would be objectionable.
We are therefore of opinion, that the fact of the dedication of this square to public uses by the first proprietor and founder of Philadelphia, is too clear to admit of any dispute — that nothing has ever been done on his part, or by the commonwealth or city since, that in the least impairs this vested right of the city in it; that the act of Thomas Penn in 1741, in undertaking to sell a part of it to a'religious society as their exclusive property and for their exclusive isse, under the pretence of its being vacant ground, was without authority, and passed no title whatever to the grantees. If he has conceived he might do so, he was mistaken in his rights: and the cor-, poration for whose use it was taken, then and ever since of thex highest respectability of character, have notwithstanding, in receiving this grant, had the misfortune to acquire property, to which their grantor had no title, the ground having long before been granted away by his ancestor to the use of others, who held the prior right.
The warrant and survey and patent therefore conveyed no title to the defendants. But it has been contended, 1st, that they are protected by the lapse of time; and 2d, the equity of their case has -been brought in to aid this defence.
1. It is well settled that lapse of time furnishes no defence for an encroachment on a public right; such as the erecting of an obstruction on a street or public square. This doctrine has very recently been examined by this Court in the case of The Commonwealth v. M‘Donald, (16 S. & R. 395,) which was an indictment for erections, on Water street, in the city of Pittsburg; and in Rung v. Shone-berg'er, which was an action for prostrating buildings in the town of Petersburg. In the former, Mr. Justice Duncan, in his charge to the jury says, “on an indictment for this encroachment, the statute *487 does not run: no length of time protects.” And again in delivering the opinion of the Court, “ to presume a grant, would be presumption run mad: it would be against the positive proof in the cause: whatever the defendant’s grants are, he has shown, and they exclude all presumption of others. All the cases of presumption have been for private nuisances and in civil actions.” “ No length of time will legalize a public nuisance — unless there is a limit to prosecutions by statute, there is no limit. Public rights cannot be destroyed by long continued encroachments: at least the party who claims the exercise of any right inconsistent with the free enjoyment of a public easement or privilege, must put himself on the ground of prescription, unless he has a grant or some valid authority from the government.” The case of Rung v. Shoneberger, was the case of a public square, and the language of Mr. Justice Rogers, in delivering the opinion of the Court is equally positive, and is appropriate to the points before us. “ It is admitted,” says he, “ that the erection of a public building on a street, (Commonwealth v. M‘Donald,) is a public nuisance: but a distinction has been attempted between a street and a square. In this state there are few ancient towns in which squares such as this do not form part of the plan. They are generally located at the intersection of the streets, and are intended as sites for the erection of buildings for the use of the public, such as court houses, market houses, school houses and churches; sometimes they are designed for ornament, and at others they are intended for the promotion of the health of the inhabitants, by admitting a free circulation of air. The squares as well as the streets, and for the same reason, are placed under the superintendence of the local authorities, who have full power to regulate them so as more effectually to enforce the purposes to which they have been dedicated. Public squares, unlike commons, are. not intended for the exclusive use of the citizens of the city or borough where they are situated, but are designed for the comfort and convenience of strangers in the pursuit either of business or pleasure. It would be an abuse of the grant to attempt to appropriate the enjoyment of them to citizens in exclusion of others.” “ The learned Judge who ruled this cause, expressed an opinion that if a person was suffered to build a house on one of the beautiful squares in the city of Philadelphia, and was permitted to remain there twenty-one years, his title would be good. But this depends on the question whether the building was a public or private nuisance. The case put as an illustration by the Court, we will determine when it arises; but I must be permitted to observe, that I have but little faith in the correctness of the opinion. For although the city has a qualified property in the ground, yet the corporation is but a trustee for the public, for whose use and benefit the squares were left open. The enjoyment of them is free, as things of common right, to all the citizens of the commonwealth, subject however, as I before observed, to such *488 regulations and restrictions affecting all, as are not inconsistent with the grant. And in this respect I am at a loss to see any difference between a street and a square. If the erection of a building on a square is a common nuisance, the plaintiff can acquire no right by long-continued possession.”
These principles are of universal application, and control the present case as well as others. There is no room for presumption since the grant itself is shown and proves defective; and if there were no grant shown, presumption will not be made to support a nuisance, by encroachment on a public right; and no statute of limitations bars the proceeding by indictment to abate it. These principles, indeed, pervade the laws of the most enlightened nations as well as our own code, and are essential to the protection of public rights, which would be gradually frittered away, if the want of complaint or prosecution gave the party a right. Individuals may reasonably be held to a limited period to enforce their right against adverse occupants, because they have interest sufficient to make them vigilant. But in public rights of property, each individual feels but a slight interest, and rather tolerates even a manifest encroachment, than seeks a dispute to set it right; Commonwealth v. Passmore, (1 Serg. & Rawle, 220.) And of this the present case is a proof, where the respectable character of the defendants as a corporation and individuals, and the purpose for which they used the ground, would inspire the greatest reluctance even in those whose duty it strictly was, to proceed to legal measures against them. This the tardiness of the city’s proceedings manifests.
As to the equity set up by the defendants, it would not be proper perhaps, to examine it, because we have not the means, if it existed, to award a compensation for it, or preclude the city from their right. •It does, however, appear by the evidence, that the defendants in 1782, were aware that this square was “ one of those reserved in the original plan of the city of Philadelphia, for the benefit of the citizens thereof.” That prior to this time they had “ encroached on other lots within the square,” for the purpose of interment, and in that year asked for three acres and three-quarters and thirty-one perches and five-tenths of a perch, including the one acre eight perches and six-tenths patented by the proprietary; but the legislature did not grant the request. It further appears that in March 1800, the city brought an ejectment to recover the ground they occupied, and in February 1801, an agreement was made with a committee of the city corporation, by which the latter agreed to aid the former inf obtaining a grant of a vacant lot on Mulberry street, between Fifth and Sixth streets from Schuylkill; in consideration of which the defendants agreed they would on obtaining it, take down and remove the fence surrounding the part in their possession, and put up a handsome pale fence round that part in which bodies were interred, and would within ten years remove that fence and inclose only that part for which they had a patent, leaving the rest open and in pos *489 session of the city: no interments to be made in future oñ any other part of the square; and the right of either party to the part patented not to be affected by the agreement. ' The defendants sent a committee to the legislature, of which Mr. Peltz was one, who says they stated as reasons for the application that a suit had been brought, and if persisted in, the congregation would probably lose the ground, and have no place for burying the dead. The legislature by act of 19th of Feb. 1801, granted them a- lot, described as containing 396 feet by 288, for the purposes of a burial place and site of a charity school; and by the act of 14th of April 1835, authorized them to sell such part as they thought proper; the proceeds to be applied to the repair of their buildings on Race street. The ejectment of the city was marked ‘settled’’in October 1801, and discontinued in November, another agreement having been made between the city-and the defendants, dated 20th September, 1801, (a copy of which was proved by Mr. Peltz,) which stipulates for the immediate surrender of the.possession; makes provision for paying for the new fence; alters the time of taking it down and putting it up round the patented part to 15 years; provides for immediate surrender of all on which there were no interments, and adds that they will erect no buildings on the patented part, and that length of possession shall not operate as a bar to the claim of the city on any part thereof, in any suit to be thereafter instituted for that purpose, but that the compromise should be without prejudice to the rights of either party: and the defendants took a lease of the same date, of the unpatented part for 15 years at the rent of 5 shillings. In March, 1819, they gave up the part held under this lease.
This evidence goes far to rebut the equity the defendants might-otherwise have from payment of £50, and the interest from 1741. They have had the exclusive occupation for the purpose of interment ; a use it is believed equivalent to the interest of their money, if not in later periods a source of revenue to the church. In addition to this, they hád in 1801, the gift of a large and valuable lot from the legislature, one of the vacant city lots, which has been growing in value since, and the grant of which was aided by the city, and it would seem by the evidence of Mr. Peltz, was given as a compensation for the ground they occupy; and -if that were not the case, yet it takes away any ground of equity in their claim. As to want of notice, that cannot be sustained; because the evidence of the appropriation of the lot was of record in the surveyor-general’s office, for the information of those who chose to apply, and of which all concerned were bound to take notice, and in or before 1782, it was known to the defendant’s predecessors. More might be added on this copious subject, but. it would extend this opinion into needless prolixity. We are of opinion that the indictment is supported by the evidence, and that the motion for a new trial should be denied.
New trial refused.