## Baird *et al. versus* Rice *et al.*

63    489
167    49
63    489
d197    6

1. The original of "Holme's Map" of Philadelphia is an official paper on file in the proper office, of great antiquity and public importance.

2. The Act of August 5th 1870, authorizing commissioners to erect a court-house and municipal buildings on Penn Square and vacate so much of Broad and Market streets as may be necessary, is constitutional.

3. Broad and Market streets, to the extent of Penn Square, are part of the square of 10 acres in the centre of the city, laid out by William Penn for buildings for "public concerns."

4. By the Act of 1870, the legislature simply appropriated the square and streets to the purposes to which the square was originally dedicated.

5. The legislature had power over the streets.

6. The Act of March 3d 1866, providing that in consideration of the pavement or the improvement of Broad street by the owners of property on the street, no obstructions, &c., should be constructed on the street, &c., had no application to the buildings contemplated by the Act of 1870.

7. There was no contract under the Act of 1866 impaired by the Act of 1870.

8. The history of the dedication by William Penn of public squares in Philadelphia in this case.

9. Commonwealth *v.* Alburger, 1 Whart. 469, remarked on.

January 4th, 5th and 6th 1869.   Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

In the Supreme Court, Eastern District: in Equity: No 20, to January Term 1871.

On the 3d of December 1870, an application by bill in equity was made to C. J. THOMPSON by Matthew Baird and others, for an injunction against John Rice and others, commissioners, Daniel M. Fox, Mayor, S. W. Cattell and Louis Wagner, President of the Select and Common Councils of Philadelphia.  The bill set forth :—

1. An Act of Assembly of August 5th 1870, authorized the above-named commissioners to erect public buildings for the courts and for all municipal purposes in Philadelphia, and they were authorized to locate the buildings on Washington Square, or Penn Squares, as might be determined by a vote of the electors of Philadelphia, at the general election in October 1870.

2. Should Penn Squares be selected, the commissioners were authorized to vacate so much of Market and Broad streets as they might deem needful, the streets passing around the buildings not to be less than 100 feet.

3. At the last election the voters selected Penn Squares, and it became the duty of the commissioners to proceed to erect the buildings on Penn Squares, unless the commissioners had by the acts of omission or commission thereafter set forth, become disabled to act.

4. A majority of the commissioners threatened to erect the buildings partly on Market and Broad streets, and partly on Penn

[Baird *v.* Rice.]

Squares, thereby obliterating both broad and Market streets to the extent of the length and breadth of the buildings, in violation of the aforesaid act.

5. The commissioners had not adopted the necessary plans nor obtained specifications or estimates, and had advertised for proposals without specifying quantities, or requiring the proposals to be sealed, or inviting proposals for erecting the entire buildings, and therefore the cost of the buildings could not be estimated. The advertisement for proposals was here inserted.

6 and 7. The intent of the act was that the plans should be prepared, that voters might vote intelligently, but the commissioners did not procure the plans, and had not adopted any plans, specifications or estimates: it was therefore uncertain what course the commissioners would adopt.

8 and 9. The cost of the building, if erected as intended by the commissioners, would be many millions of dollars, and greatly add to the public debt and taxes of Philadelphia, and the neglect of the commissioners in the matters set forth was in violation of the act and irreparably injurious to the tax-payers.

11. Matthew Baird and four others of the complainants own real estate in fee simple on Broad street which had paid the cost of the Nicholson paving and macadamizing Broad street in front of their property since the passage of an act approved March 3d 1866, and they were entitled to the benefit of the contract therein in favor of the owners of property on Broad street. The material parts of the act are as follows:—

" Whereas, For the uses and purposes of the public, and the benefits and advantages which will enure to them by making and for ever maintaining Broad street, in the city of Philadelphia, for its entire length as the same is now opened or may hereafter be opened, the principal avenue of the said city, and for keeping and preserving the said street for ever free from and unobstructed by railroad tracks extending along the same, as well as for the purpose of enabling and authorizing the said city to remove or cause to be removed all railroad and railway tracks and other obstructions laid or constructed along the same and impairing its uses for public services, as aforesaid.

Sect. 1. *Be it enacted, &c.,* That the city of Philadelphia be and is hereby authorized, empowered and required to occupy and appropriate Broad street, in the city of Philadelphia, for its entire length, as the same is now opened, or may hereafter be opened, and from curb to curb thereof, except as hereinafter provided, for the use and purposes of a public drive, carriage-way, street or avenue, and to improve the said street or portions thereof, from time to time, and in whole or in part, with such mode of paving, pavement, macadamizing, gravelling or other roadway, as may in the judgment of the Select and Common Councils of said

city be best adapted to and for the uses and purposes aforesaid ; and for that purpose the said councils shall have, and are hereby authorized to enact such ordinances or resolutions, with such conditions and stipulations, as may require the cost of said improvements to be paid for by the owners of property abutting upon said street.

Sect. 4. "That upon the improvement of said (Broad) street or any portion thereof, as provided in the first section hereof, and in consideration of the payment of the cost thereof by the owners of property abutting thereupon as aforesaid," * * * " no person or persons, or corporation of any kind, nor the city of Philadelphia shall, at any time hereafter, be authorized or empowered to locate, lay, construct or maintain any railroad or railway tracks, or other obstructions prejudicial to the uses and purposes aforesaid, along or upon said street, or any portion thereof (except at the intersection of streets, and for the purpose of crossing said Broad street.)

Sect. 5. " The Select and Common Councils of the city are hereby authorized and requested to enact all ordinances or resolutions necessary and proper for the carrying into effect the requirements, provisions, and purposes of this act, and in like manner to require any railway tracks hereafter to be laid and constructed upon Broad street, to be done under the direction of the chief engineer of said city, in such manner as shall not interfere with any carriage or roadway, or boulevard which may occupy the centre portion of said street; and all acts or parts of acts inconsistent with the terms and provisions of this act be and the same are hereby repealed."

12. The obliteration of Broad street at Market street and several hundred feet below and above, and the erection of elevated buildings on Broad street, would be a violation of the contract contained in the above-stated Act of 1866, and if the Act of August 5th 1870 gave such power to the commissioners, it would be unconstitutional.

They prayed :—

2. That the commissioners be restrained from making any contracts for the construction of said public buildings, under the proposals so as aforesaid issued by them, or otherwise interfering or acting in reference thereto in any manner soever.

3. That the presidents of the city councils, and the mayor, be restrained from signing or approving any ordinance appropriating any moneys or laying any special tax in aid of the construction of the said public buildings as aforesaid.

4. That it may be finally adjudged and decreed by the court that the contract in the said Act of 23d of March 1866 contained, in favor of the owners of property abutting on Broad street as aforesaid, shall be and stand firm and inviolate.

[Baird *v.* Rice.]

The complainants afterwards filed an amended bill against the commissioners, mayor and members of the councils, setting forth:—

1. That the complainants are residents and tax-payers and owners of real estate in Philadelphia; that the city councils intend to pass an ordinance levying a special tax for the year 1871, for the purposes of the building commission, which the complainants aver is in express violation of the provisions of the act commonly called the Consolidation Act.

2. That the building commission intend to enter into contracts for the erection of the public buildings, and thus involve the said city in debt and liability, before the city councils shall have approved the plan of the said buildings, and irrespective of any action of the councils in the premises, which the complainants aver is contrary to the provisions of the act commonly called the Consolidation Act and its supplements, particularly that part which provides " That no debt or contract thereafter incurred or made shall be binding upon the city of Philadelphia, unless authorized by law or ordinance, and an appropriation sufficient to pay the same be previously made by councils."

3. That the city councils intend to make an appropriation for the use of the building commission, out of money raised by taxation.

They prayed :—

1. That the councils be restrained from passing, and the said mayor from approving any ordinance levying any special tax for the uses and purposes of the building commission, or making any appropriation of moneys raised by taxation for said purposes for the year 1871.

2. That the commissioners be restrained from entering into any contracts for the construction of said buildings, before the plans for the erection of the same shall have been approved of by the city councils.

An injunction affidavit was made by Robert J. Paschall, and a preliminary injunction was granted. At the hearing at Nisi Prius, December 3d 1870, James D. Whetham and others, property-holders on Broad street, were on their petition permitted to intervene and defend *pro interesse suo.*

The affidavits of John Rice, president of the commission, and of a number of other persons were read; amongst others was the following from John McArthur, the architect of the commission :—

" I am the architect of the public building commission. I received my appointment from the commission on the 15th day of September, of this present year. Immediately after my appointment I was directed by them to prepare plans of general arrangement for the public buildings, which could be made applicable to either Washington Square or Penn Square. I made such plans and submitted them to the commission for correction.

[Baird v. Rice.]

" Several modifications and additions were directed to be made. These plans were not completed at the time of the election. It was impossible to prepare accurate plans for such a building within twenty-one days,—the time between my appointment and the election. I would not think the commission justified in binding the city by a contract on plans so hastily prepared.

" Six months were given by the commission appointed by councils in which to prepare plans for Independence Square; some of the competing architects complained of that time being inadequate, and petitioned to have it extended. After the election I commenced a set of plans specially adapted to Penn Square, which were referred to a committee. This committee directed me to prepare two sets of plans for their information, one set for the intersection of Broad and Market streets with one building, and one for four separate buildings (one on each square). I prepared these plans and submitted them. They were returned to me with a resolution directing me to prepare a report upon them, stating their relative cost of execution, all of which I did.

" After submitting my report I was directed to proceed with plans for the buildings to be placed at the intersection, and also to furnish, at the earliest moment, a specification of such materials and labor as might be required in their construction during the year 1871, which I did.

" The first plans made by me for the intersection, contemplated the streets surrounding the buildings to be 100 feet wide, in accordance with the Act of Assembly creating the commission; these plans were not adopted, because the streets were not deemed of sufficient width. I was, therefore, directed to make new plans with streets not less than 135 feet wide.

" The plans now being made have streets of 135 feet in width on the southern and eastern and western fronts, and 205 feet in width on the northern front. These widths are from the extreme projections of the building, the average widths being much greater."

The hearing was then adjourned to the 4th of January 1871, before the Chief Justice and his associates as assessors.

It was argued by *George D. Budd, W. Henry Rawle* and *George W. Biddle*, for the complainants; by *Charles H. T. Collis, F. Carroll Brewster*, Attorney-General, and *Meredith* (with whom was *William B. Mann*), for the defendants, and by *George W. Woodward*, for James D. Whetham and others.

The reporter regrets that his space will not permit him to give such a synopsis even of the arguments as will do justice to them.

The opinion of the court was delivered, January 18th 1871, by

READ, J.—On the 30th March 1870, was passed an act in relation to a site for the public buildings in the city of Philadelphia, providing for their erection on the site which the largest number of votes shall declare their preference for by their ballots. The only material part of this law now, is the proviso : That the buildings shall not be placed on Independence Square.

On the 5th August 1870, another act was approved by the Governor, appointing certain persons commissioners for the erection of the public buildings, required to accommodate the courts, and for all municipal purposes in the city of Philadelphia; and they were authorized and directed to locate them on either Washington Square or Penn Square, as may be determined by a vote of the legally qualified voters of the city of Philadelphia, at the general election in October, one thousand eight hundred and seventy. At this election the qualified voters of the city cast 51,625 votes for Penn Square, and 32,825 votes for Washington Square; being a majority of 18,800 for Penn Square; thus establishing beyond all question, the unbiassed choice of her citizens.

The board which had organized under the law, proceeded to execute the duties prescribed, and were met by a bill in equity, filed by six citizens, and an amended bill by the same individuals.

The first bill was against the commissioners. The amended bill was against the commissioners, and the members of the select and common councils. Each bill has two prayers for injunction ; and a motion for a preliminary injunction has been very fully argued on the merits before the Chief Justice and his brethren, whom he has called in for advice.

The question really presented is, whether the plan proposed by the commissioners, to place the public buildings at the intersection of Broad and Market streets, and upon the streets themselves, is legal, or according to the language of counsel, "constitutional." "The plans now being made," says Mr. McArthur, the architect, "have streets of 135 feet in width, on the southern and eastern and western fronts, and 205 feet in width on the northern front. These widths are from the extreme projections of the building, the average widths being much greater."

This involves the original plot of the city as laid out by William Penn, with a square of 8 acres in each quarter of the city, to be kept open for ever, and a *centre square* of 10 acres in the centre of the city, for buildings for public concerns. Out of 1280 acres, the founder devoted 32 acres for open gardens for ventilation and health, and 10 acres for public buildings. These dedications were made by Penn, more than one hundred and seventy-seven years ago, and upon the faith of which lots were sold, and the city built. The plan before us proposes to carry out one part of Penn's plan, by placing in the centre of his city, a magnificent and most useful structure, to accommodate the municipal business and concerns of near a million of people.

"There are also in each quarter of the city a square of 8 acres, to be for the like uses as the Moorfields are in London." Here is a specific dedication, and when we find what were the uses in Penn's time (1682) of the Moorfields, we then see what were to be the uses of the four squares of 8 acres.

William Penn was an Englishman, and his early colonists were Englishmen, and their habits, customs, manners, usages and terms were English ; and in seeking their meaning, we are obliged to look to the mother country. He was born in London in 1644, and died in 1718 ; and he was twice in Pennsylvania, once in 1682 for two years, and again in 1699 for two years.

It appears by a map of London as it was in 1563 that there were north of the city walls two fields marked on it—one called Schmyt Fyeld, which for a long series of reigns was the field of gallant tilts and tournaments, the other called Finsburie Fyeld. The first is now West Smithfield, in which market the most lucrative and largest business is transacted for the sale of all kinds of cattle in the world. The second comprised gardens, fields or morass, the last being the original state of this part of London. This tract was in the manor of Finsbury, or rather Fensbury, and in the days of the historian Fitzstephen was an errant fen. This map represents the Moor Gate in London Wall opening into it, and a marked tract as far as Finsburie court with a Dogge House some distance to the right of the gate.

These fields were outside of the city of London, and there is a memorandum on the plan or map, "Moorfields not divided nor planted." At the close of Queen Elizabeth's reign and the commencement of King James's reign, Moorfields was divided and planted, as we find by the concurrent authority of Seymour and Maitland in their valuable accounts of London. In Seymour's Survey of London, vol. i., p. 17, it is said, speaking of Moorfields:

"In the mayoralty of Sir Leonard Halliday (Anno 1606) these fields (before an unhealthful place) were turned into pleasant walks, set with trees, compassed with brick walls, and made convenient by sewers under ground for the conveyance of water, *which cost the city five thousand pounds*, or thereabouts. The lower part of them has been gravelled and railed in a very strong and handsome manner, and the plantations there, which are like so many gardens in the four quarters, were not finished until the present year (Anno 1733), in the mayoralty of John Barber, Esq."

These fields, called Moorfields and West Smithfield, were absolutely prohibited from ever being built upon by the charter of King Charles the First of the 18th October 1638, granting them to the corporation of the city of London, it being an express condition of the grant in this positive language:—

"We will also, and by these presents for us, our heirs and successors, declare and grant that the said mayor and commonalty and citizens and their successors for ever may have, hold and enjoy

[Baird *v.* Rice.]

all those fields called or known by the name of the Inward Moor and Outward Moor, in the parish of St. Giles without Cripplegate, London, St. Stephen in Coleman street, London, and St. Botolph without Bishopsgate, London, or in some or any of them; and also all that field called West Smithfield, in the parish of St. Sepulchre, St. Bartholomew the Great, St. Bartholomew the Less, in the suburbs of London, or in some of them, to the uses, intents and purposes after expressed; and that the said mayor, commonalty, and citizens and their successors may be able to hold in the said field called Smithfield, fairs and markets there to be held, and to take, receive and have pickage, stallage, tolls and profits appertaining, happening, belonging, arising out of the fairs and markets there, to such uses as the same mayor, commonalty and citizens or their predecessors had held or enjoyed, and now hold and enjoy, or ought to have, hold and enjoy the said premises last mentioned, and to no other uses, intents or purposes whatsoever; and that we, our heirs or successors, will not erect or cause to be erected, nor will permit or give leave to any person or persons *to erect or build a new one, or any messuages, houses, structures, or edifices in or upon the said field called Inner Moor, or the field called Outer Moor*, or the said field called West Smithfield, but that the said separate fields and places be reserved, disposed and continued to such like common and public uses as the same fields *heretofore* and *now* are used, disposed or converted to." Maitland's History of London, p. 312.

This charter is specially stated in Norton's Commentaries on the History, Constitution, and Chartered Franchises of the City of London (third edition revised, 1869), p. 400 : " The King declaring that he will not allow of these fields to be built upon." In an article in the twenty-eighth volume of the Law Magazine and Law Review on the Charters of the city of London, Mr. Serjeant Pulling, very high authority, says, p. 270, " Charles I. granted further the tracts of open ground, then called *Moorfields*, and also expressly confirmed the city title to West Smithfield, *with a proviso that they should not be built upon.*"

In 2 Maitland's History of London, p. 892, is a print dated 1754, representing the lower quarters of Moorfields as four rectangular gardens, planted with trees, and surrounded by walks. See also 1 Id. 432, The City and Liberties of London after Great Fire of 1666, and Id. 369, London as fortified in 1642 and 1643.

Even Pennant, in 1790, recognises this state of things, for he says, p. 253, " Successive attempts brought the ground into the state we see it at present, most part of which, *except the still neglected Moorfields*, is covered with streets."

The enclosed moorfields, under the names of Finsbury Square and Finsbury Circus, two railed squares, or gardens of six and four acres, and West Smithfield, five acres, are to be found in the

[Baird v. Rice.]

map of London, in Bohn's Pictorial Handbook of London, 1854, or in that of the Great London Directory of 1855. "Squares," says Bohn, p. 769, "are an excellent feature, peculiar to the large towns of England, but more particularly to London, being distinguished from the *Piazze, Plazas, Places*, &c., of continental cities, by having originated in a sacrifice of building ground, not to the purposes of ornament and architectural beauty, but to the pure necessity of ventilation. They are therefore in the newer parts of London, more numerous and larger than in other capitals, *but not appended to any public buildings* (which usually hide in obscure secondary streets), and not making any pretension to more adornment than the ordinary dwellings. A garden enclosed by open railing serves to hide the ugliness of sham art, refreshes the eyes, wearied with the sombre monotony of our rude dwellings, and though occupying some of the space, hardly impedes the circulation of air, but according to modern chemists actually helps to renew it."

After speaking of Inigo Jones's attempt to introduce the Italian Piazza in Covent Garden, he says: "His next attempt of the same kind (Lincoln's Inn Fields), has been more fortunate, remaining still the largest ventilation of London, next to its parks (more important even than they, from its central situation), and now by far the best grown with timber. The equilateral form of this prototype of our squares has been pretty generally followed in all of them till within the last twenty years, but we now have them of all proportions, up to a lengthy slip, besides one oval (*Finsbury Circus*), and many semicircles or segments, called *crescents*. For all rectilinear figures, even triangles, the term square is retained."

"The following are the chief squares of the older class (rectangular, with their sides nearly or quite equal), with the approximate area of each in acres:—Lincoln's Inn Fields, 12; Russell Square, 10; Belgrave, 10; Grosvenor, 7; Portman, 7; Park Square, Portland Place, 7; Euston, 7; *Finsbury*, 6; and seventeen others."

Of an oblong shape, 13.

Openings of other regular forms: *Finsbury Circus*, 4; and five others.

Places of irregular forms: *Smithfield*, 5; and three others.

"All openings exceeding an acre or two have now been planted with railed gardens, except Smithfield and Trafalgar Square."

The last is called an artificial stone quarry.

In the Commonwealth *v.* Alburger, 1 Wharton 473, Judge Sergeant, speaking of Holme's map, says "The plan was engraved, and impressions taken for the use of those interested;" and says of the original, it is "an official paper on file in the proper office, of great antiquity, and public importance;" and it is so treated by Judge Smith in his learned note in 2 Smith's Laws, p. 107.

13 P. F. SMITH—32

"Now," says Judge Sergeant, p. 474, "the first of these plans (Holme's) lays down the streets of the city, and the five public squares, lying across the streets, so as not to be mistaken, or confounded with the rest of the ground assigned for lots or left vacant. The lots of the first purchasers are marked on the plan by numbers. In three of the squares the lots run up to them, and in front of them, giving ten lots on the south and east of the north-east public square; six lots on the north and east of the south-east public square; and five lots on the north and west of the south-west public square; but no lots are placed on the squares. So the lots continue along High street to the centre square, both from Delaware and Schuylkill Front streets, but stop at its boundaries. The second plan agrees with the former; but in addition, the north-east and south-east squares have written on their face 'eight acres for public uses;' the north-west, "eight acres given for public uses, by Wm. Penn, Esq.;' the south-west, 'eight acres allotted for public uses, &c.' On the centre square is written, 'Centre Square, ten acres.' This is strong evidence to show that these spaces of ground were laid out as squares for public uses, distinct from the streets and lots, and other property in the city bounds, when the original plan of the city was made by its founder.

"*The advertisement annexed to the list of first purchasers* stands on the same footing as the list itself. After describing the site of the city and its advantages, it says: 'In the centre of the city is a square of ten acres; at each angle *are to be* houses for public affairs, as a meeting-house, assembly or state-house, market-house, school-house, *and several other buildings for public concerns.* There *are also* in each quarter of the city a square of eight acres, to be for the like uses as the Moorfields in London.' Moorfields were secured to the city of London, by charter, dated October 18th 1638, from being built on, and that they should be put to such like common and public uses as they had been and were used for."

"That five public squares were thus laid off by the founder, and the first purchasers here, in the original plan of the city in 1683, and were then dedicated to public uses, is thus a fact as clearly established as any ancient fact can be by evidence, especially as no plan or draught or statement to the contrary has ever been made or suggested in those times or for a long time after. If there is any fact in the history of the city, universally acknowledged without question by its inhabitants, its founder, its historical writers, its maps and plans, and owners of property and settlers, it is that Penn laid off five public squares for public uses:" Commonwealth *v.* Alburger, 1 Whart. 475.

The Centre Square is distinctly mentioned in his charter to the city, dated the 25th of October 1701, "and the one-and-twentieth year of my government." In a map of the improved part

of the province of Pennsylvania, by Thomas Holme, surveyor-general, in the right hand corner, there is a small plan of the city with the five squares on it. Broad street and High street are represented running up to the Centre Square, on which appear four buildings, one at each angle, and a building directly in the centre of the square, or what might be called the intersection of the two streets, if continued through the square, with a steeple or belfry. I have been furnished by Henry E. Keene, Esq., a descendant of John Lukens, surveyor-general from 1761 to 1789, with an engraved map of the city, found among his papers. On the upper part of this plan are the names of those who took up liberty lands, and the names of the first purchasers, and below them a view of the State-house, which was finished in 1734. Upon the plan are the four squares, on each of which is engraved, "a Publick square, 8 as." On the Centre Square it is, "a Publick square, 10 as., Cen-ter." "The old court-house had been built in 1707, in Market street above Second street, and was used not only as a hall of justice, but also as a legislative hall, in which the provincial assemblies transacted their business, and the general elections were held there."

A market-house had been built from the court-house to Third street, and by an Act of Assembly of 23d March 1786, the wardens of the city were authorized and required to extend the market-house from Third to Fourth streets, and under a subsequent general act the market-houses were extended to Eighth street, and built west of Broad street, and on Broad street south of Centre Square.

Under the word "watering," the city of Philadelphia erected their water-works. They consisted of two receiving basins on the Schuylkill, above Chestnut street, an engine-house, on a hill corner of Chestnut and Front streets, with a brick-arched conduit to conduct the water to the Centre Square, where it was pumped up into the centre engine-house for distribution in the city. This building at the intersection of Broad and Market streets was placed there by the city without the authority of any legislative act, and remained there for a quarter of a century, until rendered useless by the improvements at Fairmount.

The public records remained in Philadelphia from 1681 to 1799, when the seat of government was removed to Lancaster, where the legislature sat in the brick court-house, at the intersection of King and Queen streets, the two principal streets, until its removal to Harrisburg, in 1812. The court-houses in Reading, York, Easton, and other county towns were similarly situated.

The original square was 10 acres, and this area could only be obtained by including Broad and Market streets; but this can make no difference, for the legislature is simply appropriating the square and the streets to the purposes to which the square was originally dedicated. But the power of the legislature over the

[Baird *v.* Rice.]

streets cannot be a matter of discussion, and it is provided that, " In the event of the ultimate selection of Penn Squares as the site for the said public buildings, the said commission shall have authority and they are hereby empowered to vacate so much of Market and of Broad streets as they may deem needful; provided, however, that the streets passing around said buildings shall not be of less width than 100 feet."

It is objected that this act is a law impairing the obligation of contracts, and therefore unconstitutional by the constitutions of the United States and of this state.

On the 26th March 1866, the legislature passed an act authorizing the improvement of Broad street, the real object of which was the removal of all railroad tracks from it, and their prohibition in it for the future. These railroad tracks were to be removed by money voluntarily subscribed by the citizens to compensate their owners, and the improvements on said street such as repaving by Nicholson pavement, were to be paid for by the owners of property abutting upon the said street, and in consideration of either one or the other, or both, no railway tracks or other obstructions prejudicial to the purposes of said act should be laid, constructed, or maintained upon it. It is clear this act has no application to such a building as the present; and if it had, no voluntary subscription of a single dollar ever has been made, and the Nicolson pavement never has been paid for, but the city is left to pay nearly the whole cost, being upwards of $100,000.

Of the plaintiffs there are but two who have paid a cent for any part of the Nicolson pavement, and they are the owners of 100 or 200 feet front on this great street, eleven miles and a half long, or having a front of 121,540 feet, and who seek to represent all the other owners of property on it. There is nothing in the Act of 1866 preventing this erection either in its language or its spirit, and the two plaintiffs have shown no case for the interference of this court.

The city of Philadelphia has expended, and is still expending, large sums of money for a great public park for the health and recreation of her citizens, whilst she has entirely neglected the comfort and convenience of the inhabitants in the daily transaction of judicial and municipal business. Our courts are not adequately provided with proper court-rooms, consultation and retiring-rooms, or rooms for jurors and for witnesses, and have no fire-proof offices for the preservation of valuable records; the recorder's office is in the second story of a bank, and the various city offices are so scattered in every direction as to require a special directory for a citizen having business with the city authorities.

The site has been selected by the public voice, and it should now be the business of every fair-minded citizen to see the buildings pushed to a speedy completion.

Injunction dissolved.