## STATE v. FRANKLIN FALLS COMPANY & a.

The maintenance of dams without fishways in an unnavigable river, which is
    the out-let to a large inland lake, thereby obstructing the passage of mi-
    gratory fish from the sea to the lake, constitutes an indictable offence at
    common law.

Section 20 of chapter 251, General Statutes, and sections 57 and 62 of
    chapter 1, Laws of 1868, are constitutional so far as they relate to dams in
    the Winnipiseogee river.

No right will be acquired as against the state by the obstruction of a public
    fishway, though continued for more than twenty years under a claim of
    right, if such obstruction in fact originated without right.

### STATEMENT OF FACTS.

INFORMATIONS, filed by the attorney general against the defend-
ants for not providing suitable fishways over the dams across the
Winnipiseogee river, in Franklin. One of the informations is
against the Franklin Falls Company and Walter Aiken; the other
three are each against the Franklin Falls Company alone.

For the purpose of raising the questions of law likely to arise, and
determining the same, *it is agreed* that the dam named in the first
information was built in 1821, and the other three in 1809, 1852
and 1804, respectively, and that each had been kept up by their sev-
eral owners since that time. The north end of the first-named dam
is owned and used by the said Walter Aiken, and the south end by
the said Franklin Falls Company, each owning to the middle of the
stream. The Franklin Falls Company erected their mill at the first
named dam in 1863-1864. This dam is repaired and maintained un-
der the general law of the state, as such dams usually are. Since
the Franklin Falls Company built their mills, in 1863 and 1864, the
power at this dam, at the lowest water, is not more than sufficient
to carry the machinery, but prior to that time, there was a large sur-
plus of water in the river at all times which was not used. The de-
fendants claim that the construction of the fishways would be a great
damage to their water power. No fishways of any kind have been
provided at either dam. It is further agreed that these facts may
be regarded, for the purposes of this case, as if found by the court

---

the old survey was properly received as evidence in the case." Perley, C. J.,
concurred in the result, in a brief oral opinion, in which he took a very direct
path of his own.

*Marshall & Chase*, for plaintiff.

*Minot & Mugridge*, for defendant.

upon the plea of not guilty, and such judgment rendered or disposition made in each case as the court deem proper.

*Attorney General, and Pike & Blodgett,* for the state.

*Barnard & Sanborn,* for respondents.

The crime imputed to the respondents is maintaining dams across the Winnipiseogee river without providing suitable fishways, to be approved by the fish commissioners, as the informations state, " to the obstruction and hindrance of the fish in passing up and down said river, and to the common nuisance of all the citizens of this state." The informations are founded upon sec. 20, chap. 251 Gen. Stat., and the additional act of 1868.

It is not the erection of the dams, but their *continuance* in the precise condition they were when this law overtook them, that is complained of; in effect, that the owners of dams have not expended a necessary amount of their own money to greatly damage their own water power, in defiance of the legislative order. The owners of these valuable privileges, with entire respect, question the right of the legislature to impose upon them this burden. They claim to possess their property by the same law that other private property is held; with the same right to enjoy it, and alike subject to the pre-eminent right of the state. Its right of *eminent domain* is no where questioned, and applies to all property within its limits. But so carefully is this attribute of sovereignty guarded, that it can be exercised only in cases of clear public benefit, and upon ample compensation. The state does not pretend to apply it in this case. It is true, that private property is designed to be taken; or what is precisely the same, its value materially impaired, for a possible public benefit, and here the analogy ends; for instead of compensation, comes the additional hardship of a large pecuniary tax upon the owners to render the benevolence of the state available. Therefore, unless the state can show some greater and different right to interfere with these mill privileges than it has in the control of ordinary private property, this prosecution must fail. No case has arisen in this state, of which we have any knowledge, wherein the respective rights of the public and the riparian proprietors, in regard to fish in small inland streams, have been defined. By the common law, the use of navigable rivers belongs to the public, and the fishing is common; but rivers not navigable belong entirely to the proprietors of the land on their respective sides, *ad filum medium aquœ,* and to them belongs the exclusive right of fishing therein. *Palmer* v. *Mulligan,* 3 Caines 319; *Scott et al.* v. *Willson,* 3 N. H. 324; *The People* v. *Platt,* 17 Johns. 195, and authorities cited. In these and subsequent cases cited upon this subject, acknowledgment is made to Lord Hale's learned treatise, " *De jure Maris et Brachionum ejusdem,*" which is universally received as law. The common law considers only those rivers navigable wherein the tide ebbs and flows.

By usage some others may become public highways, yet this does not change the rights of the riparian proprietors to the exclusive fishery and other uses of the water. Such streams are still private property, but subject to the servitude of the public for passage way, and for no other purpose. The public have no right of fishery therein. See cases before cited, and *Vinton et al.* v. *Welch,* 9 Pick. 87 ; *Commonwealth* v. *Knowlton,* 2 Mass. 535 ; *Commonwealth* v. *Chapin,* 5 Pick. 199 ; *Hooker* v. *Cummings,* 20 Johns. 99 ; *Lord Fitzwalter's case,* 1 Mod. 105. Whether or not a stream is entirely private property, or is private property subject to the public right of way, depends upon its capability of being used and its actual use as a passage way. *The People* v. *Platt* ; *Scott et al.* v. *Willson.*

The Winnipiseogee is not in either sense a navigable river. It belongs exclusively to the riparian proprietors. The public have no rights concerning it. Its value consists not in its fisheries nor the facilities it affords for transportation, but alone in the uses which the owners of land along its banks find for it. It was, early in the settlement of the country, appropriated for the use of mills, and dams erected, many of which have been continued to the present day. We do not claim exemption from the well-known maxim; *sic utere tuo ut alienum non lœdas,* which applies to all property. But it is only when the injury is to the *public* that an indictment can be maintained at common law. It cannot be found upon an injury to private rights, such as obstructing the passage of fish in streams not navigable. 3 Black. Com. 217, 218 ; *Commonwealth* v. *Knowlton,* 2 Mass. 530 ; *Commonwealth* v. *Ruggles,* 10 Mass. 391 ; *Commonwealth* v. *Essex Company,* 15 Gray 247. Whatever right, then, the legislature has to limit the usefulness of these dams must be derived from its own enactments. Before referring to them, it may not be unprofitable to notice some of the early colonial legislation and usages regulating the passage of migratory fish, which the law under consideration resembles, and a few decisions in other states. All "fishings" were included in the original grant to the Plymouth Company, and in the subsequent charter of Charles I. of the territory which afterward constituted the Colony of Massachusetts Bay, and the right to their entire control was there early assumed. We find, accordingly among the " body of liberties " a declaration intended to abolish game laws and exclusive fisheries, which afterward became embodied, in terms, in the ordinance of 1641, by which any person "may pass and repass on foot through any man's *propriety* for that end "— to fish and fowle—" so they trespass not upon any man's corn or meadow." It was a particular interest, at this early date of paramount importance, which this ordinance was calculated to protect and develop. In this spirit other enactments followed in that Colony, until in 1709 was passed " an act to prevent nuisances by hedges, wears, and other incumbrances obstructing the passage of fish in rivers," which prohibited " wears, hedges, fish-garths, stakes, kiddles, or other disturbance or incumbrance to be set, erected or made across any river to the stopping, obstructing or "*straitening*" of the

natural or usual course and passage of fish in their seasons, without the approbation and allowance first had and obtained from the general sessions of the peace in the county," who are authorized "to grant the liberty or deny it as they shall see it to be either a public good or damage." And the act declared "all wears, hedges, fish-garths, stakes, kiddles, or other incumbrance whatsoever," erected contrary to the same, common nuisances, and provided a process whereby the offending party should be tried and the nuisances removed by the sheriff or constable, at the cost of the party offending. It will be observed that mill-dams are not enumerated among the obstructions. The law was a very stringent one in favor of fish, yet we infer that with the growth and increasing refinement of the Colony, other industries had somewhat lessened their importance; for the act provided "*that nothing herein contained shall be construed to extend to the pulling down or demolishing of any mill-dam already made or that shall hereafter be lawfully and orderly made.*" 2 Mass. Laws 992.

In 1741 we find another act requiring fishways in dams across streams where salmon, shad, alewives and other fish usually pass up, *and providing full compensation for alterations made in dams erected prior to* 1790, *by the towns "advantaged" thereby.* Section 3 of the act provided for the choice of persons by the several towns, to see that the fish were not obstructed in their passage, and to locate the proper places and appoint the times for taking them in scoop-nets. 2 Mass. Laws 1020. Among other peculiarities of Massachusetts legislation upon this subject, were the grants to towns of the fisheries within their limits, which could be wholly appropriated by them, even to the sale of the exclusive right of fishing in the public navigable rivers. This right, Parsons, C. J., declared to be "a part of the common law of the state." *Coolidge* v. *Williams*, 4 Mass. 140.

This was, substantially, the condition of the law in Massachusetts, when, in 1808, the case of *The Inhabitants of the town of Stoughton and other towns* v. *Baker et al.* 4 Mass. 522, came before the court of that state. A legislative committee was authorized to rebuild the fishway in defendants' dam, and impose three-fourths of the expense of such alteration upon the owners. The court found that though the defendants and their grantors held the dam by a grant more than one hundred years old, and always without any sluice-way for the passage of fish, yet they held it under the implied limitation of allowing a sufficient passage way for fish; and this limitation being for the benefit of the public, inattention or neglect would not extinguish it, "for no laches can be imputed to the government, and against it no time runs so as to bar its rights." This decision is expressly based upon the ancient and long continued customs of Massachusetts to control private rights in regard to the fisheries, which, with the aid of colonial and provincial enactments, had entirely displaced the well known doctrine of the common law upon the subject, and substituted mere police regulations. The opinion proceeds without any reference to the common law, nor is a single case cited nor authority referred to.

The only vestiges of the common law in it, are the assent given to the old arbitrary maxim, *nullum tempus occurrit regi,* and the suggestion of a possible right the owners might have to appeal to the country, if the committee should happen to locate an unnecessary fishway. Soon after this decision we find an action *qui tam* for taking fish contrary to the statute where the plaintiff in his declaration alleges the taking of fish "at the mouth of Little river *and in the sea.*" Held, that the legislature could oblige all citizens to conform to the regulations upon this subject." *Burnham* v. *Webster,* 5 Mass. 266.

Following these decisions, we are not surprised to find others in that state falling naturally into the same channel. But they expressly reject all claim to be founded upon the common law, and rely upon established customs and the course of legislation for authority. *Commonwealth* v. *Chapin,* 5 Pick. 199; *Vinton* v. *Welch,* 9 Pick. 87; *Commonwealth* v. *Essex Company,* 15 Gray 248.

Some of these usages and customs which sprung up in Massachusetts under the ordinance of 1641 and gradually ripened into law, are examined in the well-considered opinion of Judge Bellows in *Clement* v. *Burns,* 43 N. H. 609, though that case was decisive of a subject not at issue in the present one. In the case of *Commonwealh* v. *Essex Company,* the court, after commenting at length upon these previous decisions, held that the Essex Company having erected a fish-way as required by their charter, could not afterward be required by the legislature to alter it, although insufficient for the passage of fish. The case was decided in 1859 and would seem to be a departure from the earlier doctrine. The right of control over the waters of the state has been carried to an extreme point in Massachusetts, particularly in regard to rivers not navigable, which we believe no other state has reached. In New York the question of providing fish-ways arose in the case of *The People* v. *Platt,* 17 Johns. 195, upon indictment found upon a statute very much resembling ours.

The doctrine of *Stoughton* v. *Baker* was ably reviewed by the counsel, and Spencer, C. J., who delivered the opinion. The theory that a dam built across a stream not navigable, held by grant and occupied as private property, must be always subject to the right of the public for the passage of fish, was clearly demonstrated to be untrue at common law. It was there held that the public had no right of fishery in such stream; that the erection of a dam whereby salmon were prevented from passing up the same was not an indictable offense at common law, and that the statute requiring the owner of such dam to build a fish-way therein at his own expense, was unconstitutional and void. The right of taking private property for a public benefit *upon making compensation,* is fully recognized in this case by the court; and it is asserted that had the Saranac, the stream in question, been navigable, the power of regulating and controlling it would have been impliedly reserved in the grant; "but not being so, the legislature have no greater right to pass laws directing how the waters of that river shall be used, than they have to regulate the

use of the most inconsiderable rivulet"—and " had the question been propounded to the legislature, whether they intended to invade private rights so far as to compel the proprietors of those valuable and extensive establishments near the mouth of the Saranac, with their own hands to destroy their usefulness, by altering their dams so as to deprive them of the use of the water to any beneficial purpose, when these proprietors had acquired by a grant from the state, and the law of the land, an ample and uncontrollable right to the sole and uninterrupted use of these waters, it cannot be doubted from the high and sacred regard to · private rights which the legislature have always observed, that they would indignantly have disavowed any such intention."

Counsel also cited and commented upon *State* v. *Tyre Glen*, 7 Jones (N. C.) 421. In North Carolina, Pennsylvania, and perhaps some other states, all the large rivers were early taken possession of by the state under the power of *eminent domain*, and declared navigable.

The same question was decided within a few months by the court of common pleas for the twelfth judicial district of Pennsylvania, in the case of the *Commonwealth* v. *Pennsylvania Canal Company*. The company are owners of twenty-six dams across the Susquehanna river and its branches. In 1866 the assembly of that state passed an act requiring every individual and corporation maintaining any dam across the Susquehanna and its branches, including the Juniata river, to keep up at each dam a " sluice, weir or other device, for the free passage of fish and *spawn* up and down said stream in such manner as the commissioners may devise." The company had held and enjoyed the property, without fish-ways, for about nine years previous to the passage of the act. The court held that the act was null and void so far as it imposed on the company the duty of changing the dams at its own cost, and that the property could not be taken, nor its usefulness to the owners lessened, for a public benefit, except upon compensation, although the Susquehanna had been made a navigable river above tide water. A writ of error was taken, and the question is now awaiting decision in the supreme court. We are indebted to Judges Read and Pearson of Pennsylvania for our information in regard to it.

Early legislation in New Hampshire in regard to the passage of fish, seems to have been an attempt to harmonize the conflicting interests of the mill-owners and the owners of fish rights. An act of the legislature passed in 1790 prohibited the erection of any mill-dam or other obstruction on the " Winniposockee " and " Merrimac " rivers more than half way across, from the first day of May to the last day of October in each year, and provided penalties for continuing the same contrary to the provisions of the act. It further prohibited obstructions in streams falling into the Merrimack where fish usually pass, prescribed the modes of taking fish, limited all prosecutions under the act to within six months after the offense, allowed two months in which to remove obstructions and repealed all

former acts. This was in effect a prohibition of the use of the water of the Winnipiseogee river for mills, and such great difficulties arose and damage was sustained, that in order to make the mills "much more productive and accommodating," the law was modified by an act approved December 9, 1800, which allowed dams to be extended across Winnipiseogee river, provided a sufficient passage way for fish was kept open, "to be ascertained and accepted by the selectmen of the two next adjacent towns." In 1807, the dams across certain streams in Nottingham West were exempted from the operation of the law requiring fish-ways, because the mills thereon were rendered useless by keeping them open for the passage of fish. The various acts upon this subject were embodied in the law of 1811, requiring fish-ways in dams across the Winnipiseogee, Pemigewasset and Merrimack rivers, and any stream falling into the same, from the tenth day of May to the twentieth day of June, and from the twentieth day of August to the twentieth day of September, annually. This remained the law, substantially, until 1823, when all acts prohibiting the erection of any dam, or requiring any fish-ways whatever, *so far as they related to the Nashua and Winnipiseogee rivers*, were repealed; and in 1831, all the fish-way laws were swept from our statutes. We mark in this legislation the slow but steady advance toward the great manufacturing interests of to-day, which the resuscitation of these laws affect so unfavorably, and the gradual awakening to the fact that the wealth of our streams is not in "salmon, shad and alewives," but in that illimitable power which has reared upon the sand of Amoskeag the most populous city of the state.

With all restrictions upon the use of the water of Winnipiseogee river, thus removed by law, the present owners of the dams in question purchased the property.

We claim that the good faith of the state is pledged to their ample enjoyment of it, and that the acts of 1823 and 1831 have all the force of a positive grant. Whatever right the state then had was *yielded* to the proprietors of the dams. Not through neglect, but by deliberate legislative enactment, confirmed after a lapse of sufficient time to note the result. Some of the most important rights of persons and property had origin in the withdrawal of sovereign power; and the courts hold them inviolable. We are unable to detect a substantial difference between a law giving additional rights to a citizen, and one removing restrictions upon his former rights. In effect, they are alike.

Until 1823, the state reserved a portion of the water at these dams for the passage of fish. The owners could then regulate the erection of mills and other expenditures according to the amount of water upon which they could rely to furnish power. And they undoubtedly did, for, as the case finds, other mills have been erected since 1823, and the additional power which the repeal of the law requiring fish-ways gave them, wholly appropriated, until, as the case further finds, there is now no surplus at the lowest water, which usually occurs

in the season when this law requires the fish-ways to be kept open. The state gave them this right, and a direct consequence was, large investments and expenditures.

It is a right vested not alone by long enjoyment, but, as we have shown, by positive enactment. Even in *Stoughton* v. *Baker*, the court admit the right to exclude the implied condition to have open fish-ways in dams, provided there is an express waiver of it.

It would hardly be complimentary to this court to argue to-day, that the legislature cannot interfere with vested private rights, nor appropriate private property for public use, without compensation. This has been repeatedly laid down as law, and is characterized by Chief Justice Perley as "a maxim recognized in all just and enlightened governments, and which has been assumed as fundamental and unquestionable in all cases where the point has arisen incidentally in this state, and may be considered to have been directly adjudicated in *Piscataqua Bridge* v. *N. H. Bridge*, 7 N. H. 66; and," continues the Chief Justice, "we should not hesitate to declare that a legislative act could not be legally enforced, which should undertake to appropriate private property to public use without provision for compensation to the owner. When an act authorizes private property to be taken for public use, the law must also provide a legal method of ascertaining the amount of compensation to be paid." Petition of Mount Washington Road Company, 35 N. H. 142.

No argument can demonstrate that the water power at these dams is not private property. If it *is* private property, then the owners have a legal right to use it, and it cannot be taken against their consent without compensation. *Gardner* v. *Newburgh*, 2 Johns. Ch. R. 162.

By the act of the legislature upon which these informations are founded, not only the water is taken, to the great detriment of the mills, but the money of the owners is taken to a large amount before the alterations contemplated by the act are completed. For we do not consider the act of June, 1867, allowing the fish commissioners to expend such sum as they may deem proper in the construction of fish-ways, of any practical force, so limited are its provisions, and dependent upon so many contingencies. If the legislature have this power, why may they not as well compel these parties to build highways through their own land, at their own expense, and keep the same open and passable during certain months in each year. There are other cases in point. In *Washington Bridge Company* v. *The State*, 18, Conn. 54, it was held, where a company was incorporated to build a bridge, and by their charter required to maintain a draw in the bridge of thirty-two feet, that it transcended the power of the legislature to require the company to extend the draw to fifty feet. So in Virginia, where permission was given to one to erect and maintain a dam in a mode prescribed by law, which was done, it was held that it was beyond the limits of legislative power to compel the owner at a late day to erect a lock therein for the passage of boats, at his own expense; 6 Randolph, 245. If a private stream is made

navigable, the legislature cannot appropriate it to the public without compensation. Angell on Water Courses 1, 601. *Wadsworth, Adm'r,* v· *Smith,* 2 Fairfield 278. In Pennslyvania, it has long been the law that where the line of surveys ran across streams of water, and the owner of the land erected a mill-dam on the stream, he could keep it without molestation, after the legislature had declared the creek or river a public highway, and the owner could not be obliged to fit his dam for the passage of boats and rafts ; but if done, it must be at the public expense. *Schinely* v. *The City of Alleghany,* 1 Casey 128. If the state can revoke its grant to the former proprietors of these privileges, whose title the respondents have acquired according to law, and for which they have paid a valuable consideration, violate its contract, take private property for public use without compensation and make its benevolence to the public a grievous burden upon an individual, then it has the power to do what the constitution has expressly forbidden.

If the owners of the dams have not title, as against the public, to the exclusive use of the water by positive grant, they have it by prescription. They and their grantors have claimed and occupied it since 1823 " adversely, uninterruptedly and under claim of title." The doctrine of *Stoughton* v. *Baker* that " no laches can be imputed to the government, and against it no time runs so as to bar its rights," is not law in New-Hampshire. In its application to fish-ways it has been distrusted in Massachusetts we should suppose, for it seems that for some years past a provision has been inserted in the charters of companies incorporated to build dams in that state, requiring fish-ways in them. *Commonwealth* v. *Essex Company,* before cited. Unlike New Hampshire too, legislation in favor of the passage of migratory fish, never rested nearly forty years, in Massachusetts. The question of prescriptive right may be considered as adjudicated in *Webber* v. *Chapman,* 42 N. H. 326, wherein the question of adverse possession as against the public, is carefully examined in the learned and exhaustive opinion of Mr. Justice Sargent. The doctrine is there fully recognized that individuals may gain prescriptive rights against the public, and in the case of a highway, it was held that if it be " inclosed by an individual and occupied by him adversely, uninterruptedly and under claim of right for more than twenty years, he will acquire a prescriptive right to the land as against the public and all persons claiming or justifying under any public right or easement ;" and fully sustaining this doctrine by authority, the court declare that it " is in accordance with the spirit of the age and sound reason." The correctness of this decision was solemnly acknowledged by the legislature when they interposed the act approved July 6, 1867, declaring that " no owner or occupier of any mill-dam or other water-power shall acquire, by prescription, any right against the state or the public, to impede, or in any way injure the navigation, or passage of fish, or any other public easement, in any of the waters of this state," which, of course, can not apply in this case. Applying the law of *Webber* v. *Chapman* to the present case, any

public easement in the water of the Winnipiseogee river at these dams was clearly extinguished when the present law was passed requiring fish-ways. If it is to receive new life from the legislature, like the relaying of a discontinued highway, proceedings must begin *de novo*, and honest payment made for private property taken or despoiled. Should it be objected that the state attempts the control of the passage of fish through these dams, by invoking its police power, our confident reply is, that however unlimited this power for the abatement of nuisances which endanger the public health and safety, and for compelling all owners of property to so use their own as not to injure others, still it must always be brought to the same constitutional test.

We ask the court to exempt the dams in question from the operation of this act, because, in its application to them, it is unconstitutional. Whether or not it may apply to other dams upon the Winnipiseogee river, or to those upon the other streams mentioned in the act, must be ascertained when the proper time arrives. We are aware that we may not, as a strictly legal privilege, doubt that the act contemplates a public benefit; but could the legislature have had in mind that this little stream, sixteen miles in length, intersected by twelve or more dams, around which have grown up villages whose thrift is due to them alone, and the half dozen rivulets falling into it, which legislative wisdom has dignified with the name of "tributaries," each bringing its contribution to the general wealth, were of inestimable value to the public, and that their usefulness would be seriously checked by such laws as the one under consideration, we may well question if it would have found a place among statutes, at a time when every day is demonstrating more and more clearly, that the prosperity of the state in the future must be derived from its manufactures.

*Smith, J. Some facts, material to a decision of this case, though omitted in the agreed statement, are not understood to be in controversy. The Winnipiseogee river is the outlet of Lake Winnipiseogee. About sixteen miles from the lake it joins the Pemigewasset river, and the two united form the Merrimack river, which flows in a southerly course through New Hampshire to Massachusetts, and in a winding course through Massachusetts to the sea. The Winnipiseogee river is above the ebb and flow of the tide, and is not used for purposes of navigation.† The Merrimack, within New

---

*Bellows, C. J., Nesmith, J. and Foster, J., did not sit.

† Note. It seems formerly to have been understood, that the Merrimack river extended only from its "mouth" "as far as the salt water flows, or to the first falls about a mile above Haverhill meeting-house," "and from thence" was known as the "River Winnipisseokee till it comes to the head thereof, viz.: the Great Pond Winnipisseokee." See proceedings of the House of Representatives of the province of New Hampshire, August 20, 1737. REPORTER.

Hampshire, is not a tidal river. Lake Winnipiseogee is of such an irregular shape, that it is not easy to calculate its area. Its greatest length is about twenty-five miles; the width varies from one to ten. The lake is considerably used for purposes of navigation. Before the establishment in the Winnipiseogee and Merrimack rivers of dams without fish-ways, shad were accustomed to pass to and fro between the sea and the lake, ascending to their breeding grounds and descending thence to the sea. These migratory fish are not now found in the lake. It is extremely difficult, if not impossible, for them to ascend the river while obstructed by dams without fish-ways.

Was the maintenance of the dams, thus obstructing the passage of the fish, a criminal offence at common law? If it be admitted that the right of fishing in the Winnipiseogee river belongs exclusively to the riparian propritors, and that the wrong done to one of these riparian proprietors by the act of another in obstructing the passage of fish is not of the nature which the law will redress by a criminal prosecution, it does not follow that the obstructions now complained of are not criminal. The riparian proprietors are not the only persons injured. The right of fishing in the lake is not limited to the proprietors of the shores, but is common to all citizens of the state, just as much as the fishery in the tide waters of the Piscataqua. " In this country, our great navigable lakes are properly regarded as public property, and not susceptible of private property more than the sea." 3 Kent's Com. 429, note *b*; *West Roxbury* v. *Stoddard*, 7 Allen 158; *State* v. *Gilmanton*, 9 N. H. 461. The obstruction of this public right of fishing is a public nuisance, punishable at common law by indictment.

If the tide waters of the Merrimack were within the limits of this state, it might be necessary to consider whether the dams do not obstruct another public right; the fishery in the tidal part of the river. If the effect of a barrier at a point between the tidal limits and the upper breeding grounds is to diminish and to gradually annihilate the stock of migratory fish in the tidal part of the river, it might be urged that the effects of the barrier " extend into the area of the water used by and in the hands of the public." This subject is discussed in the judgment of the English fishery commissoners, reported in *Leconfield* v. *Lonsdale*, L. R., 5 Com. Pleas, 657, page 663-666; but no opinion need be given on it here.

If the fishery statutes in force some sixty years ago superseded, for the time being, the common law, the repeal of those statutes in 1823 and 1831 revived the common law; see 1 Kent's Com. 465-6. Section 28 of chap. 1 R. S. not having been enacted till after the repeal in 1831, does not affect the question. The repealing acts of 1823 and 1831 have not "the force of a positive grant," as contended by respondents, but merely leave the rights and liabilities of all.parties where they were before the statutes thus repealed were first enacted. Whether in any event the repeal of a prohibitory law *ipso facto* confers a license, irrevocable by the state, is a question which it is not now necessary to decide.

If the maintenance of the dams constituted a criminal offence at common law, the recent statutes (G. S. chap. 251 sec. 20 ; Laws of 1868, chap. 1 sec's 57, 62) would be clearly constitutional, merely enforcing a common law liability.   If the Merrimack river is obstructed in Massachusetts by dams without fish-ways, that fact does not necessarily confer impunity upon the respondents.   New Hampshire has the right to punish acts committed within its limits, which, alone and of themselves, are sufficient to cause a public nuisance, although similar acts are done in Massachusetts which would cause the same result in New Hampshire, if no acts whatever had been done in New Hampshire.     Upon any other theory public rights in rivers extending through two states, might be utterly destroyed without remedy in either jurisdiction.   We are not, however, to assume the existence of such obstructions in Massachusetts, in the face of the statement in sec. 57 of chap. 1, Laws of 1868, that fish-ways have been erected "over the dams on the Merrimack river, below the boundary of this state."

It appears that three of the dams were maintained in their present condition more than twenty years prior to the enactment of chap. 2622, Laws of 1862 ; and it is claimed that the owners thereby acquired a prescriptive right against the public.   If this claim is well founded, the provisions of the General Statutes and of the Laws of 1868, so far as they relate to these three dams, are unconstitutional. These statutes cannot be supported as an exercise of the right of eminent domain, because no compensation is provided for the property-owners although the value of the property may be materially diminished by the enforcement of the statutes.   The only other ground on which they can be plausibly supported is the police power of the state. (See 2 Kent's Com. 9th Ed. 420-421.)   This power is often properly exercised in a manner very prejudicial to individual property owners, and its limits are not easy to define ;  but we think it does not extend to a case like the present.   If it be admitted that the right of the state to regulate the mode of enjoying or using property, may in some cases be legally exercised in such a manner as to practically prohibit the use of the property for any purpose beneficial to the owner, (see *Coates* v. *Mayor of New York*, 7 Cow. 585) still this right of regulation, like the right of eminent domain, is not to be exercised on all occasions.   The restoration to the public of the shad fishery in the lake, has not such a direct relation to the public health as the prohibition of interments within city limits ; nor the same direct relation to the public safety as the prohibition of the erection of wooden buildings in the midst of a populous village.   The obstructions in the river, do not cause positive annoyance or damage to the public.   The injury is negative in its character.    The indirect benefits to the public health, or to the means of support, do not seem to warrant the legislature in depriving the respondents of valuable rights without compensation.    Any rights which the respondents may have acquired by prescription, are as much their property as any other property they possess.

This view renders it necessary to decide, whether the respondents could, by twenty years' adverse user, acquire a right against the state. The legislature has fixed on twenty years as the proper time of limitations for bringing actions to recover real estate. By analogy to the rule, that twenty years' adverse possession gives a title to real estate, the courts have held that adverse user, for the same length of time, is sufficient to give title to an easement belonging to real estate. *Wallace* v. *Fletcher*, 30 N. H. 434, p. 447. The rule of law on this subject is evidently based, in part, upon the presumption that the average of mankind will seek to enforce their private rights, if they really have any, before the expiration of twenty years, and that few persons will loose valuable rights by the adoption of this period of limitation.

Experience does not justify the presumption that the community at large will assert their public rights, with the same promptness with which individuals assert their private rights. The opposite is notoriously true. " Individuals may reasonably be held to a limited period to adverse occupants, because they have interest sufficient to make them vigilant. But, in public rights of property, each individual feels but a slight interest, and rather tolerates even a manifest encroachment, than seeks a dispute to set it right." Sargent J., in *Com* v. *Alburger*, 1 Wharton, 469, says, " In private nuisances and civil actions, presumptions of grant from length of time may be rebutted by proof that the enjoyment was acquiesced in, not by the owner of the inheritance, but by one who possessed a temporary interest only ; such a tenant for life or years, whose negligence or laches cannot be allowed to prejudice the owner of the inheritance. \* \* \* \* How much less, then, ought the acquiescence of the neighbors in a public nuisance affect the public right?" Duncan, J., in *Com.* v. *M'Donald*, 16 Sergent & Rawle, 390, p. 400.

The state is impersonal. "The people do not, and cannot legally, act in a body." Their power must of necessity be exercised only through agents. It cannot be expected that these agents will manifest the same vigilance in detecting and resisting encroachments on public interests, that individuals evince in the protection of their private rights. Moreover, the state officials are generally few in number and fully occupied with the regular routine of official duties. They do not generally institute proceedings to punish violations of the laws, except at the instigation of individuals. It may be doubted whether these officers are ever aware of a very large proportion of the infringements on the rights of the state.

It has been thought by some that the maxim, " *nullum tempus occurrit regi*," is an outgrowth of monarchical despotism, and, therefore, inapplicable under our republican form of government. But, whatever may have been its origin, this maxim has now for a long time-been maintained as a part of the common law, not for the personal convenience of the sovereign, but " for the security and benefit of the people." The true reason of the maxim, according to Judge Story, " is to be found in the great public policy of preserving

the public rights, revenues, and property from injury and loss, by the negligence of public officers.    And though this is sometimes called a prerogative right, it is, in fact, nothing more than a reservation or exception, introduced for the public benefit, and equally applicable to all governments."    *U. S.* v. *Hoar*, 2 Mason, 311, p. 313–4; see, also, Parker Baron, Hardres, p. 27, Weston, J., in *Willion* v. *Berkley*, Plowden, 223, p. 242–3 ; Co. Litt. 90, *b.*   " All the reasons in support of this rule in the case of a king, apply with greater force here, where the people are the sovereign."  The maxim in question is not a part of the common law " repugnant to the rights and liberties contained in the constitution of New Hampshire ;" and may well be held to " remain in force here ;" constitution of N. H. article 90.

It seems, however, unnecessary to decide in the present case, whether the maxim, " *nullum tempus occurrit regi*," in its strict literal meaning, is a part of the common law of New Hampshire. For the question here is not, whether the public right can be barred by adverse user for an indefinite length of time, extending back so far that its origin cannot be certainly known ; but, whether an adverse user which begun within the memory of persons now living, and which clearly has existed without right, shall bar the public.

If it be admitted that lapse of time will, if sufficiently extended, bar the public right, or authorize a presumption of a grant from the state, the question still remains whether a *longer* lapse of time is not necessary to accomplish this than is considered sufficient to bar the rights of private persons.    See 1 Green. on Ev., sec. 45.

The position that a jury might in this case from long user be authorized to presume a grant from the state, may be answered in the emphatic language of Duncan, J., in *Com.* v. *M'Donald*, 16 Sargent & Rawle 390, p. 400 : " To presume a grant, would be presumption run mad, it would be against the positive proof in the case."    There is no room for presumption where the defendant's title is shown and proves insufficient to justify his encroachment on the public right; see Sargent, J., in *Com.* v. *Alburger*, 1 Wharton 469. If the public right is held to be barred in this case, it must be by mere lapse of time, without any other circumstances to justify a presumption of a grant, and against evidence that no grant ever was made.

We are aware, that it has been held in this state, that the exercise of the corporate powers of a town, under a claim of right, for the period of twenty years, without interruption and with the assent of the state government, furnishes a conclusive presumption of a grant of a charter from the state.    *Bow* v. *Allenstown*, 34 N. H. 351. Without laying stress on the fact that, in *Bow* v. *Allenstown*, the state did not appear and question the right of Allenstown, it is apparent that there are at least two marked distinctions between that case and the present.    First, it was a material fact in *Bow* v. *Allenstown* that some of the acts were done with the assent of the state government.    It appears that statutes had been enacted by the leg-

islature, "incidentally recognizing the town of Allenstown as a town." See Bell, J., 34 N. H. 370 ; Upham, J., in *New Boston* v. *Dunbarton*, 12 N. H. 409, 412.    Secondly, there is a fundamental difference between the act of the state presumed in *Bow* v. *Allenstown*, and the act sought to be presumed here.    The grant of a town charter is not an act presumptively prejudicial to the public, like the grant of a right to obstruct a public fishery.    In the present case the obstruction was, at the outset, a public nuisance, and it is so still, unless mere lapse of time has transformed a criminal act into an indefeasible right.

We do not now decide that adverse user, whose origin is involved in obscurity, and which has continued for a great length of time, will in no case bar a public right.    We simply decide that an adverse user, which is known to have originated without right within the memory of persons now living, will not alone and of itself, legitimate a public nuisance, or bar the public of their rights.

This view is supported by what we regard as a decided preponderance of direct authority in England,—*Fowler* v. *Sanders*, Cro. Jac. 446 ; *Folkes* v. *Chad*, 3 Douglas 340 ; Ellenborough, C. J., in *Weld* v. *Hornby*, 7 East, 195, p. 199 ; *Rex* v. *Cross*, 3 Campb. 224 ; *Vooght* v. *Winch*, 2 Barn. & Ald. 662,—and also in this country ; *Knox* v. *Chaloner*, 42 Maine, 150 ; *Stoughton* v. *Baker*, 4 Mass. 522 ; *Com.* v. *Upton*, 6 Gray, 473 ; *Simmons* v. *Cornell*, 1 R. I. 519 ; *Mills* v. *Hall*, 9 Wend. 315 ; *Renwick* v. *Morris*, 3 Hill, 621 ; S. C. 7 Hill 575 ; *People* v. *Cunningham*, 1 Denio 524 ; *Phil. Wilm. & Balt. R. R. Co.* v. *State*, 20 Maryland 157 ; *Com.* v. *M'Donald*, 16 Sergent & Rawle, 390 ; *Com.* v. *Alburger*, 1 Wharton 469 ; see, also, *Phipps* v. *State*, 7 Blackford, Ind. 512 ; *State* v. *Phipps*, 4 Ind. 515 ; *Elkins* v. *State*, 2 Humph. 543.

It is also strongly supported by the established doctrine that the state cannot be disseized (see Kent, C. J., in *Jackson* v. *Winslow*, 2 Johns. 80, p. 83 ; *Cary* v. *Whitney*, 48 Me. 516 ; 2 Wash. on Real Property, 1st Ed. 525) ; and by the well-settled principle that the state is not bound by general statute of limitations, unless expressly named therein. (See *People* v. *Gilbert*, 18 John. 227 ; and *U. S.* v. *Hoar*, 2 Mason 311.)

Some of the cases which may seem opposed to this view are not well considered, and others are distinguishable from the case at bar. *Rex* v. *Samuel Neville*, Peake 93, note, and *Rex* v. *Bartholomew Neville*, are *nisi prius* rulings of Lord Kenyon ; *Rex* v. *Smith*, 4 Esp. 111, is a *nisi prius* ruling of Lord Ellenborough ; and, if in point, must be regarded as overruled by the *nisi prius* decision of the same judge, in *Rex* v. *Cross*, 3 Camp. 224 ; see, also, Lord Ellenborough, in *Weld* v. *Hornby*, 7 East 195, p. 199.    In *Johnson* v. *Ireland*, 11 East, 280, if we understand the case aright, the user had continued upwards of one hundred and fifty years, and there was evidence of acts of the government tending to support the theory that there had been an enfranchisement by the crown.    We do not

regard the facts in *Hillary* v. *Waller*, 12 Ves. 239, as raising the question here presented; and we consider Lord Erskine's remarks, on p. 265-6, merely as *dicta*. The decision in *Chad* v. *Tilsed*, 2 Brod. & Bingh. 403, was not understood by the judges who pronounced it as conflicting with the decision in *Vooght* v. *Winch*, 2 B. & Ald. 662,—see the express statement of Park, J., 2 B. & B. p. 407,—nor as establishing the doctrine that forty years' usage can destroy an admitted public right. *Rex* v. *Montague*, 4 Barn & Cress. 598, if viewed in the light most favorable to the respondents in this case, goes no farther than this, that the court may in some instances presume that one public right has been extinguished in favor of a conflicting public right (see the comment of Walworth, Chancellor, in *Renwick* v. *Morris*, 7 Hill 575, p. 576). The question arose between a public road and a creek claimed to have once been navigable. The road had existed a long time; there was no direct evidence that the creek was navigable at the time the road was made, and all the members of the court *in banc* seem to have thought that upon the evidence there was no proof that a public right of navigation ever existed; although they also gave their opinions as to the presumption of extinguishment, supposing the right to have existed. In that case, Littledale, J., said, p. 605 : " I am not disposed to act upon the presumption, either of an act of parliament, or a writ of *ad quod damnum*, or proceedings by commissioners of sewers, unless there be some evidence to warrant that presumption."

*Elliotson* v. *Feetham*, 2 Bingh. N. C. 134, and *Bliss* v. *Hall*, 4 Bingh. N. C. 183, are not in point; and if the opinions contained any remarks favorable to the respondents, they are merely *dicta*.

In *Com'rs of Georgetown* v. *Taylor*, 2 Bay. S. C. 282, there was no proof which satisfied the court that the *locus in quo* had ever been a public highway, the court saying, " it is essential to constitute a highway, that it should not only be actually laid off *but used as such*;" there was no evidence of laying off or user.

In *Beardslee* v. *French*, 7 Conn. 125, the only evidence introduced on the trial to prove the existence of the highway was a record of laying out ninety years before, which record was in the court above, held to be fatally defective. On the trial, plaintiff offered to prove that ever since the laying out bars, had been constantly kept up by plaintiff's grantors at the place where defendants took them down. In deciding that this evidence should have been received, Hoser, C. J., made the remarks quoted in 42 M. 332-3.

In *Fox* v. *Hart*, 11 Ohio 414, the court said it was not necessary to decide "whether the maxim, *"nullum tempus occurrit regi"* is applicable or not to a highway; Birchard, J., p. 416. In that case a road was laid out in 1794, but only a part of the width was opened or used till 1838, when the supervisor opened the whole width on land claimed by plaintiff. The court said that the right to a highway might be lost by non-user, that "the law would raise a presumption of an extinguishment of the right, when the road had been aban-

doned for a long period;" but they held, that in that instance there was nothing to authorize the presumption of abandonment.

In *Knight* v. *Heaton*, 22 Vt. 480, the disputed tract was within the limits of the highway as laid out; but we do not understand that it had been opened or used as part of the highway. The language of the court certainly tends strongly to sustain the respondents here, but the decision may have been in a considerable degree induced by the legislation referred to in the close of the opinion by Redfield, J., in the following terms: "The sense of the legislature upon this subject is sufficiently indicated by a recent statute, by which it is expressly provided, that, in such cases as the present, the proprietor or occupier of land for twenty years, which was originally a portion of the highway when the same is again reclaimed by the public, shall be entitled to compensation, the same as in other cases. The statute of limitations now in express terms providing that the state shall not be exempt from its operation, we see no good reason, why one may not set up prescriptive and presumptive rights against the public, the same as against individuals. And there is perhaps no good reason, why such prescriptions should not apply as well against the public as in their favor."

In *Rowan's Ex'r* v. *Town of Portland*, 8 B. Monroe 232, the question of adverse user does not seem to have received very full consideration, other points being discussed at greater length. Neither the decision in that case, nor the language used in *Alves* v. *Henderson*, 16 B. Monroe 131, seem entitled to outweigh the authorities adverse to the views there advanced.

This subject has been discussed here at considerable length, in consequence of the apparent conflict between the result now arrived at and the decision in *Webber* v. *Chapman*, 42 N. H. 326. In that case, there was no evidence except user of the existence of the alleged public right; and the court expressly said that it was not called upon to decide that a twenty years' continuance of a public nuisance, admitted to be such, would give the individual any rights as against the public. That case may, perhaps, be further distinguished from this, on the ground that the public right there under consideration is one which numerous public officers are annually appointed to preserve and protect; whereas the right of fishery has, till recently, been left very much to take care of itself. Moreover, the public highways can in general be obstructed only by some physical obstacle erected in the highway itself, but a public fishery may be obstructed, "not merely by things done within the area of the public fishery, but by something done beyond the area, in private waters communicating with such area." The inference to be drawn from adverse user in the former case may be stronger than in the latter.

We might often decline to re-examine a question which had recently been decided by this court. In the present instance, however, if the decision in *Webber* v. *Chapman*, is regarded as in point, there is a special reason which seems to justify us in re-examining the

question. The next year after that decision, the legislature* enacted a statute (laws of 1862, chap. 2622), which established from that time forward exactly the opposite rule to that promulgated in *Webber* v. *Chapman*. On so important a topic, it has been found quite embarrassing in practice to apply one rule up to 1862, and the contrary rule after that date. Under these circumstances, we do not feel bound to adhere to the former decision, if upon examination it is found to be opposed to reason, and to the weight of authority, as well as to "the spirit of our legislation."

The justice who delivered the opinion of the court in *Webber* v. *Chapman*, concurs in this decision. For the purpose of allowing the respondents an opportunity to try questions of fact, the order is

*Case discharged.*